UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| ROBERT A. WINTER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 14-119-ART |
| | ) | |
| and | ) | |
| | ) | |
| CAMERON BLAU, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| Intervenor Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HON. STEVEN D. WOLNITZEK, *in his official capacity as Chair, Judicial Conduct Commission*, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Like a recurring bad dream, Kentucky's judicial canons keep getting struck down. First, Kentucky tried to limit judicial candidates from responding to questionnaires. *See Family Trust Found. of Ky. v. Wolnitzek*, 345 F. Supp.2d 672 (E.D. Ky. 2004). Then, Kentucky tried to prohibit judicial candidates from identifying their political party. *See Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010). Now Kentucky wants to prevent judicial candidates from campaigning as a member of a political party or identifying their party affiliation in a way that may mislead voters. When Kentucky writes these judicial canons, it must forget Thomas Jefferson's warning that "a democracy cannot be both ignorant and free." More importantly, the canons violate the First Amendment.

No one doubts that Kentucky's goals are noble.   Keeping politics out of the courtroom is a goal every state aspires to achieve.   Censoring and stifling speech, however, is not the answer.   The solution to voters potentially being misled by a judicial candidate's political speech is more speech—not government censorship.   Because the canons operate as a form of government censorship, the Court must enjoin their enforcement.

## BACKGROUND

Kentucky, like many states, holds judicial elections.   Those elections are nonpartisan—the ballot does not list a candidate's party, nor are there party primaries to select nominees.   *See* Ky. Const. § 117 ("Justices of the Supreme Court and judges of the Court of Appeals, Circuit and District Court shall be elected from their respective districts or circuits on a nonpartisan basis as provided by law.").   Instead, Kentucky has one primary election composed of all the candidates.   The top two candidates from the primary, regardless of party affiliation, proceed to the general election.   Ky. Rev. Stat. Ann. § 118A.060.

In an effort to keep politics out of judicial elections, the Kentucky Supreme Court's Code of Judicial Conduct regulates what judicial candidates can and cannot say while campaigning.   The Kentucky Judicial Conduct Commission ("Commission") enforces those rules, called Canons, and can punish violations.   *See* Ky. Const. § 121; Rule of Supreme Court of Kentucky 4.020(b) (Commission can impose, among other sanctions, "admonition, private reprimand, public reprimand or censure" for violations.).   But restrictions on speech, even in judicial campaigns, are subject to the First Amendment.   Indeed, the First Amendment protects judicial candidates' freedom to announce their views on legal and political issues, *Republican Party of Minnesota v. White*, 536 U.S. 765 (2002), and identify their political parties, *Carey v. Wolnitzek*, 614 F.3d 189 (6th Cir. 2010).

In *Carey*, the Sixth Circuit held that Kentucky Supreme Court Rule 4.300, Canon 5(A)(2), which prohibited judicial candidates from identifying their party affiliation, violated the First Amendment.   In response, Kentucky amended Canon 5.   *See* In Re: Order Amending Rules of the Supreme Court (Ky. Feb. 18, 2013).   For this case, the relevant Canon provisions are 5(A)(1)(a) and 5(B)(1)(c).  Canon 5(A)(1)(a) now states:

> (1) Except as permitted by law, a judge or a candidate for election to judicial office shall not:
>     (a) campaign as a member of a political organization.

The Commentary to Canon 5(A) explains that "a judge or a candidate for election to judicial office may publicly affiliate with a political organization but may not campaign as a member of a political organization."  Canon 5(B)(1)(c) states that a judicial candidate:

> shall not, in connection with cases, controversies, or issues that are likely to come before the court, make pledges, promises or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office; and shall not knowingly, or with reckless disregard for the truth, misrepresent any candidate's identity, qualifications, present position, or make any other false or misleading statements.

Plaintiff Robert Winter, Jr., and Intervenor-Plaintiff Cameron Blau challenge these Canons as unconstitutional under the First Amendment.  Winter was a candidate for Circuit Judge in Kenton County, Kentucky.  R. 31-3.  He sent out mailers identifying himself as a Republican candidate and his opponent as a Democratic candidate.  *Id.*  After Winter's mailers went out, the Commission sent him a letter explaining that it received complaints that his actions violated Canons 5(A)(1)(a) and 5(B)(1)(c).  R. 1-9.  In response, Winter filed this lawsuit, and the Commission agreed not to prosecute during the pendency of the case.  R. 25.

While Winter's lawsuit was pending, Blau filed an unopposed motion to intervene, R. 43, which the Court granted, R. 48.  Blau then filed an emergency motion for a temporary

restraining order and preliminary injunction.  R. 46.  Blau is running for Campbell County District Judge and wants to send out mailers to potential voters identifying himself as a "Republican candidate," or words to similar effect, and his opponent as a "Democrat candidate," or words to similar effect.  *Id.* at 2.  But Blau justifiably worries that the Commission will find that speech to be a violation of Canons 5(A)(1)(a) and 5(B)(1)(c).  *Id.* Accordingly, Blau seeks a temporary restraining order and preliminary injunction prohibiting the Commission from enforcing Canon 5(A)(1)(a) and Canon 5(B)(1)(c) against him.  The Commission opposes his motion.  R. 55.

## DISCUSSION

### I.       Standing

It is axiomatic that the Court must have jurisdiction to adjudicate a dispute.  Under Article III of the Constitution, that requires a case or controversy, and standing "is an essential and unchanging part" of that requirement.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Since Winter's standing has not been decided, Blau must have standing to proceed.  While the Commission did not clearly make a standing argument in its response to Blau's motions, the Court nonetheless has an obligation to assure itself that it has jurisdiction.

In order to have standing, a plaintiff must suffer an injury in fact—harm that is "concrete and particularized," and "actual, or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.  In a First Amendment case, a plaintiff can establish injury in fact so long as the threat of an enforcement action against his speech is sufficiently imminent. *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2342 (2014); *see McGlone v. Bell*, 681 F.3d 718, 729 (6th Cir. 2012) ("Plaintiffs may have standing even if they have never been

prosecuted or threatened with prosecution."). A threat of enforcement is concrete enough to establish an injury in fact when the plaintiff demonstrates three conditions: (1) an intent to engage in actions that are "arguably affected with a constitutional interest," (2) a statute, regulation, or other provision that "arguably" prohibits those actions, and (3) a credible threat of prosecution. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Driehaus*, 134 S.Ct. at 2342.

Blau satisfies all three conditions. First, he is currently running for judicial office, and has declared that he wants to send mailers identifying his party affiliation and his opponent's party affiliation. R. 43-2 at 2. Sending out mailers to communicate with voters is core political speech. As such, "it is certainly affected with a constitutional interest." *Driehaus*, 134 S.Ct. at 2344 (internal quotation marks omitted).

Second, the Canons likely proscribe Blau's future conduct. Canon 5(A)(1)(a) precludes a judge from "campaign[ing] as a member of a political organization." While it is unclear exactly what the statement covers, the Commission has instituted sanction proceedings against at least one candidate,[1] for identifying himself in campaign mailers as a "Republican candidate." R. 49-1. And the Commission indicated that Winter's mailers declaring that he was a Republican candidate and his opponent was a Democratic candidate may violate that Canon too. R. 1-9 (Letter from Judicial Conduct Commission to Robert J. Winter (June 2, 2014)). The Commission also stated that Winter's campaign materials may give "the false impression that the election was . . . partisan" in violation of Canon

---

[1] The plaintiffs have filed an affidavit from this candidate, containing letters and other actions by the Commission, under seal. R 49. In the interest of confidentiality, the Court will not disclose the candidate's name.

5(B)(1)(c).  *Id.*  Blau wants to engage in the same conduct as those candidates, which likely comes within Canon 5's reach.

The final factor is the credible threat of enforcement.  If "the same conduct has drawn enforcement actions or threats of enforcement in the past," then a future threat of enforcement is credible.  *Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) (citing *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *Driehaus*, 134 S.Ct. at 2345 ("[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'").  Here, Blau presents evidence that the Commission recently instituted enforcement proceedings against a fellow judicial candidate who identified himself as a "Republican" in his campaign mailers.  R. 49-1.  Additionally, the Commission sent a letter to Winter, also in this election cycle, notifying him of similar issues with his disclosure of party affiliation.  Because of the Commission's previous enforcement and threats of enforcement, Blau has every reason to anticipate enforcement if he discloses his party affiliation and his opponent's party affiliation.

The threat of enforcement here is credible for another reason:  The "authority to file a complaint with the Commission is not limited to a prosecutor or an agency."  *Driehaus*, 134 S.Ct. at 2345.  Rather, "[a]ny individual or group" can file a complaint with the Commission. Frequently Asked Questions, Kentucky Judicial Conduct Commission, http://courts.ky.gov/commissionscommittees/JCC/Pages/FAQs.aspx ("The Commission has received complaints from litigants, attorneys, judges, jurors, citizens, court personnel and prisoners.") (last visited October 28, 2014).  As a practical matter, allowing any citizen to file a complaint makes sense as it ensures that judicial candidates are accountable to all.  For standing purposes, however, it makes the threat of enforcement more credible.  *Driehaus*,

134 S.Ct. at 2345 ("[T]here is a real risk of complaints from, for example, political opponents.").

In briefing regarding Winter's standing, the defendants have said that even if that is all correct, the reasoning misses a supposedly critical distinction:  the enforcement here is purely administrative, not criminal.  R. 30 at 8.  According to the Commission, an administrative threat may not be sufficient for a credible threat of future enforcement.  *Id.* The defendants are right insofar as the Supreme Court in *Driehaus* did not decide that the substantial threat of administrative proceedings in that case was sufficient for injury in fact. While the Supreme Court made its administrative-threat discussion dicta, its reasoning is nonetheless highly persuasive.  But this Court need not rely solely on that dicta.  The Sixth Circuit has found no distinction between threats in criminal and administrative proceedings for purposes of injury in fact.  *Kiser*, 765 F.3d at 609.

Nor can the defendants find solace in the fact that the Commission has not threatened Blau with an enforcement action.  Blau intends to engage in the same conduct that the Commission has already targeted in this election cycle.  It is not "imaginary or speculative" to conclude that Blau would find himself before a Commission enforcement proceeding if he, like at least one other candidate, identified his party affiliation.  *Babbitt*, 442 U.S. at 298. Importantly, the Commission has not disavowed prosecuting Blau if he says he is a "Republican candidate" or his opponent is a "Democratic candidate."  *See Driehaus*, 134 S.Ct. at 2345.  The enforcement actions against Winter and others serve only to justify a finding of a credible threat of future enforcement.  *See Carey*, 614 F.3d at 196 (holding that dispute was ripe where Canons "chill[ed]" plaintiff's speech even though Commission had not enforced the Canons against the plaintiff).

The Sixth Circuit's recent decision in *Platt v. Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court*, No. 14-3037, 2014 WL 5002078 (6th Cir. Oct. 8, 2014), buttresses the presence of injury in fact.  The court held that the plaintiff had standing to bring his claims on very similar facts.  The plaintiff wanted to run for Ohio judicial office. The Ohio judicial canons prohibited public endorsement of other candidates, soliciting funds in person, and other conduct.  Because the plaintiff had to "censor himself to avoid violating" the Ohio canons, the Sixth Circuit concluded that the canon created what "amount[ed] to a credible fear of enforcement."  *Id.* at *2.  The same is true of Blau.  And, like this case, the *Platt* court relied on the fact that any person could file a complaint and that Ohio refused to disavow enforcement against the plaintiff.

Therefore, Blau has established an injury in fact.  He also satisfies the other two requirements of Article III standing: causation and redressability.  Blau's injury is traceable to the Canon's prohibition on his speech, and the grant of the temporary restraining order and/or preliminary injunction would redress his injury.  *See Lujan*, 504 U.S. at 560.

## II.    Temporary Restraining Order and Preliminary Injunction

Blau seeks a preliminary injunction and temporary restraining order prohibiting the Commission from enforcing Canons 5(A)(1)(a) and 5(B)(1)(c),[2] contending that they are unconstitutional as applied to him and on their face.  The Court considers four factors in deciding a motion for a preliminary injunction: (1) the plaintiff's likelihood of success on the merits;  (2) the likelihood that the plaintiff will suffer irreparable harm without the preliminary injunction;  (3) whether the injunction would cause substantial harm to others; and (4) whether the injunction serves the public interest.  *See Bailey v. Callaghan*, 715 F.3d

---

[2] Blau challenges Canon 5(B)(1)(c) only insofar as its bans speech that misleads or misrepresents.

956, 958 (6th Cir. 2013).   Because Blau has a strong likelihood of success on the merits, and balancing the remaining factors favors granting the temporary restraining order and preliminary injunction, the Court will grant Blau's motions for a temporary restraining order and preliminary injunction.

### A. Likelihood of Success on the Merits

Blau brings both an as-applied and facial challenge to the Canons.   Blau, however, makes only a cursory as-applied challenge, spending one sentence in his briefing on that issue.   R. 46-1 at 13.   At oral argument, Blau was not clear on exactly what he would say in his mailers.   Without knowing the specifics, it is next to impossible for the Court to decide the as applied challenge.   As such, to succeed, Blau must show that the Canons are facially unconstitutional.   *See Driehaus*, 134 S.Ct. at 2340 n.3 (considering only facial challenge where parties agreed that objections "were better read as facial challenges").

The parties do not dispute that strict scrutiny applies to Blau's First Amendment challenges.   Nor could they, as Canons 5(A)(1)(a) and 5(B)(1)(c) impose restrictions on the content of political speech—a core concern of the First Amendment.   *See Carey*, 614 F.3d at 198–200.   Strict scrutiny places a high burden on the Commission.   For the Court to uphold the Canons, the Commission must show that the Canons are narrowly tailored to serve a compelling state interest.   Phrased another way, the Commission must establish that there is an actual problem, and that the limitations on speech are "actually necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 131 S.Ct. 2729, 2738 (2011).   Here, the Sixth Circuit has already recognized two compelling interests in Kentucky's regulation of judicial campaign speech:   (1) an impartial judiciary, in both fact and appearance, and (2) nonpartisan judicial

elections.  *Carey*, 614 F.3d at 201.  Accordingly, to pass strict scrutiny, the Canons must be narrowly tailored to serve one of those interests.

To succeed on a facial challenge, Blau needs to show either (1) that there exist few or no situations where the Canons are valid, or (2) that the Court cannot sever the unconstitutional parts of the Canon or enjoin only its unconstitutional applications.  *Carey*, 614 F.3d at 201 (citations omitted).  Alternatively, the Court may find the Canons to be facially unconstitutional if "a substantial number of [their] applications are unconstitutional, judged in relation to [their] plainly legitimate sweep."  *Id.* (quoting *United States v. Stevens*, 130 S.Ct. 1577, 1587 (2010)).  This is known as overbreadth. Because the Canons face similar problems as the party-affiliation clause struck down in *Carey*, the Court finds a strong likelihood that Canons 5(A)(1)(a) and 5(B)(1)(c) are unconstitutional.

### 1.  Canon 5(A)(1)(a)

Canon 5(A)(1)(a) is unconstitutional because it is vague, overbroad, and underinclusive.  Each of those flaws demonstrates that the Canon is not narrowly tailored to advance Kentucky's compelling interest in nonpartisan judicial elections.  Even under the Commission's narrowing definition of the Canon—which would apply the Canon only to speech misleading voters that the candidate was a party nominee—the Canon would still fail strict scrutiny. Accordingly, the Court concludes that there is a strong likelihood that the Canon is unconstitutional.

#### a.  Vagueness

To understand if the Canon is narrowly tailored to meet Kentucky's compelling interest, the Court must know what the Canon means.  But, with regard to Canon 5(A)(1)(a), nailing down its precise meaning proves to be a substantial hurdle due to its vagueness.

A law is vague if it "fails to provide fair notice to those to whom it is directed." *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1048 (1991) (citation omitted). Vagueness, while often a separate due process concern, is relevant to a court's analysis of overbreadth and First Amendment validity. *See Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 864 (1997). The vagueness of a content-based regulation "raises special First Amendment concerns because of its obvious chilling effect on free speech." *Id.* at 871–72. If a law-abiding citizen cannot know if her speech would result in punishment, she would likely refrain from speaking to avoid the possibility of wrongdoing. Where a law's blurred lines chill election speech, then it risks suppressing information to voters—a critical First Amendment concern. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs, . . . of course including discussions of candidates." (internal quotation marks omitted)). The risk of chill is likely even greater with laws regulating judicial-election speech. Judicial candidates, who are trying to convince voters of their worthiness to pass judgment and impose punishment on others, might be especially reticent to test the validity of a provision if their actions might label them a law-breaker. For those reasons, vagueness in this context presents particularly strong First Amendment concerns.

The Supreme Court's decision in *Gentile* is instructive. The Nevada State Bar had a rule regulating pretrial publicity. 501 U.S. at 1033. Lawyers could not make statements that might materially prejudice an ongoing proceeding. The rule had a safe harbor provision allowing a lawyer to state "without elaboration . . . the general nature" of the defense. *Id.* at 1048. An attorney gave a press conference discussing elements of his client's defense,

believing he was under the safe harbor, but was later sanctioned by the Nevada Bar.  The rule was void for vagueness because "it misled petitioner into thinking that he could give his press conference without fear of discipline."  *Id.*  The safe harbor provision did not save the rule because the attorney had "no principle for determining when his remarks pass[ed] from the safe harbor of the general to the forbidden sea of the elaborated."  *Id.* at 1049.  Canon 5(A)(1)(a) has similar problems.

Under the Canon, a judge or judicial candidate shall not "campaign as a member of a political organization."  The Commentary to the Canon expressly allows a judge or judicial candidate to "publicly affiliate with a political organization" but reiterates the ban on "campaign[ing] as a member of a political organization."  How might one distinguish between public affiliation with a political organization and campaigning as a member of such organization?  The answer is far from simple.  Assume a candidate wants to send out the following statements in a mailer:

> (1) I am running for judicial office as a Republican.

> (2) I am campaigning as a member of the Democratic Party.

> (3) I have been endorsed by the Republican Party of Campbell County.

> (4) Republican Blau seeks your vote.

> (5) I am a Democratic candidate for judicial office.

A reasonable candidate for judicial office might refrain from sending out any of those statements.  Each one fits under the umbrella of "campaign[ing] as a member of a political organization."  A more adventurous candidate might send out all the statements, believing they are allowed by *Carey* as statements merely identifying his party affiliation.  201 F.3d at 203.  To add to the confusion, all five statements could also come within the Commentary's

reassurance that candidates may publicly affiliate with political organizations.  Just like the petitioner in *Gentile*, Blau cannot determine what remarks are acceptable as public affiliation with a party and which ones are prohibited as campaigning as a member of a party.

In spite of this ambiguity, the Commission contends that the Canon is not vague. According to the Commission, only statement (5) is proscribed by the Canon.  That is because the Commission interprets the Canon to prohibit *only* speech that may imply or declare that the candidate is the "official nominee of the Republican[/Democratic] Party." R. 55 at 5.  The Commission says that includes statements like "I'm a Republican candidate," and "I'm the Republican candidate."

The Canon, however, does not say that a judicial candidate shall not "represent or imply that he/she is the official nominee of a political party."   Rather, it prohibits *campaigning* as a member of a political organization.  Irrespective of the interpretive gloss the Commission now seeks to put on that phrase, it is vague.  How would one know that "I am a Republican judicial candidate" is prohibited, but "I am a judicial candidate, a Republican, and endorsed by the Republican Party," is not?   Or, that saying "I am campaigning as a member of the Democratic Party" is acceptable when "I am the only Democratic candidate" is not?  A reasonable judicial candidate would not have notice of the lines the Commission has drawn.  *See Gentile*, 501 U.S. at 1048–51.

Even the Commission does not know the boundaries of its enforcement.   It acknowledged at oral argument that it would have to see speech in context to determine if it would be proscribed.  In its brief, it explained that the phrase "'Republican Candidate' *or*

*words to similar effect*" are prohibited.[3]   *See* R. 55 at 5 (emphasis added).   But what are "words to similar effect"?   Would "I'm the Republican contender" or "the Democratic challenger" be proscribed?   What about "I'm the conservative candidate"?   In light of Kentucky's chapter of the Conservative Party, would the difference between "conservative" and "Conservative" prove dispositive?   If the Commission is not sure what speech is prohibited, then there is a manifest "risk of discriminatory enforcement."   *Reno*, 521 U.S. at 872.   That reasonable people, the Commission, and even the Court "must guess at [the Canon's] contours," *Gentile*, 501 U.S. at 1048, undercuts the Commission's claim that Canon 5(A)(1)(a) is narrowly tailored.

The Commentary's attempt to rein in Canon 5's reach is no help.   Allowing a candidate to "publicly affiliate" with an organization but not "campaign as a member" of that very organization offers little guidance to a judicial candidate.   A reasonable interpretation might be that public affiliation allows a candidate to attend political gatherings of his party, and, in a non-campaign setting, to say, "I am a Democrat."   When paired with the ban on campaigning, however, a reasonable candidate might think that he could not announce his party status in an official campaign event, such as a campaign speech or debate.   That interpretation, however, would proscribe speech that *Carey* held constitutional.

Canon 5(A)(1)(a) also encounters vagueness concerns when applied to a candidate's identification of his opponent's political party.   Remember, the Commission enforces this

---

[3] It is not clear why "candidate" is the dispositive word.  Candidate does not mean that an individual is the nominee. Black's Law Dictionary defines candidate as an "individual seeking election to an office, membership, award, or like title or status."  Black's Law Dictionary 247 (10th ed. 2014).  In fact, Black's Law draws a distinction between candidate and nominee.  "A candidate for election *becomes* a *nominee* after being formally nominated."  *Id.* at 1211 (emphasis added).  Webster's draws a similar distinction:  A nominee is "a person named or proposed for an office, duty, or position," but especially "a *candidate selected* to represent a party in an election."  Webster's Third New Int'l Dictionary 1535 (2002) (emphasis added).  Obviously, if someone says they are "the Democratic candidate," it could imply they are the nominee, but someone looking at a dictionary would not necessarily come away with that conclusion.  Also, what if someone said it before a primary that contained three Democrats?  Same problem?

Canon against self-identification of party when also paired with identification of an opponent's party. *See* R. 55 at 5. In the Commission's view, a candidate misleads the electorate if he says that he is a "Republican candidate" and that his opponent is a "Democratic candidate." It is difficult to discern how disclosing an opponent's party affiliation comes under "campaign[ing] as a member of a political organization." That language makes no reference to an opponent, an opponent's party, or identity as the party nominee.

If, in the calm and collected crucible of the courtroom, the Court cannot ascertain the boundaries of Canon 5(A)(1)(a), then it cannot expect the candidate, in the hurried and hectic storm of a campaign, to know when he or she has crossed the Canon's borders.

### b. Overbreadth

Canon 5(A)(1)(a)'s vagueness overlaps with its second problem—overbreadth. *See Reno*, 521 U.S. at 874 ("Given the vague contours of the coverage of the statute, it unquestionably silences some speakers whose messages would be entitled to constitutional protection."). Like its predecessor, Canon 5(A)(1)(a) "suppresses too much speech to advance the government's interest." *Carey*, 614 F.3d at 201. A plain-language reading of the Canon would prohibit speech constitutionally protected under *Carey*. For example, "I am campaigning as a member of the Democratic Party," or, "I am running for judicial office as a Republican." The Court will not run through an exhaustive list of all possible statements nor could it, but it suffices to say that many statements identifying party affiliation would be proscribed under Canon 5(A)(1)(a). While the Commission disclaims proscription of some of those statements, they still seem to come within the Canon's ambit. That excess renders the Canon substantially overbroad.

The Commission's ban against speech identifying an opponent's party status also poses an overbreadth problem. This prohibition presents the flip-side of the party affiliation restriction in *Carey*, but is unconstitutional just the same. If the candidate's party membership is "an issue of potential importance to voters," then, of course, so is the party affiliation of his opponents. 614 F.3d at 203. An opponent's position on the many issues encompassed by a party platform is "'relevant information to voters' on 'matters of current public importance.'" *Id.* at 202 (quoting *White*, 536 U.S. at 781–82). Voters do not evaluate a candidate in a vacuum, but rather in comparison to the other candidates. Just as party status is "a shorthand way of announcing one's views on many topics of the day," it serves an equally helpful role in revealing the views of one's opponent. *Id.* at 202 (noting that disclosing a candidate's views "allows a full airing of the issue before the voters").

In judicial elections, no less than in their legislative and executive counterparts, "[d]ebate on the qualifications of candidates is at the core of our electoral process and of the First Amendment freedoms, not at the edges." *White*, 536 U.S. at 781 (internal quotation marks omitted). Stifling that debate by preventing a candidate from mentioning her opponent's party status runs contrary to those First Amendment values and is another reason why the Canon is overbroad.

### c.  Underinclusiveness

While overbreadth and vagueness alone are enough to render Canon 5(A)(1)(a) unconstitutional, Blau also argues that the Canon is "woefully underinclusive." *White*, 536 U.S. at 780. Underinclusiveness is a First Amendment problem because it "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than

disfavoring a particular speaker or viewpoint." *Brown*, 131 S.Ct. at 2740. To analyze underinclusiveness, it is necessary to understand the interests at stake.

The Commission asserts that the Canon does just enough—but no more than is necessary—to serve the compelling interest in nonpartisan judicial elections. Nonpartisan, however, is a slippery term. Under *Carey*, nonpartisan might mean one of two things: the "avoidance of partisan influence" in judicial elections or the structure of Kentucky's judicial elections, such as the absence of party affiliation on the ballot. *See* 14 F.3d at 202–03. If it means an election absent any partisan influence, *see id.* at 202, then that ship has sailed. After *White* and *Carey*, it is difficult to say that judicial elections can ever meet that broad definition of nonpartisan. Candidates may say their views on legal and political issues, *see White*, 536 U.S. at 779, identify their party, *see Carey*, 614 F.3d at 202, and list the interest groups to which they belong, *see id.* ("[C]andidates can communicate more about their political and judicial convictions [through interest groups] than they could by carrying a party membership card."). Newspapers, blogs, Twitter, Facebook, Snapchat, PACs and Super-PACs can broadcast the same information and more. Indeed, they can even say the exact phrase the Commission seeks to prohibit: He is the Republican candidate. The Republican Committee of Campbell County can say "He is our officially endorsed candidate for judicial office." The Commission would not step in to silence any of that speech (nor could it). Yet, all of that speech implicates partisanship.

Additionally, Canon 5(A)(2) allows a judicial candidate to partake in the following partisan activities: (1) purchase tickets to political gatherings, (2) attend political gatherings, and (3) speak to political gatherings. Each of those actions adds a partisan flavor to a judicial

election.  The partisan flavor is difficult to avoid.  Regardless, Canon 5(A)(1)(a) does not put a dent in the influence of political parties on judicial elections.

Nonpartisan might mean something else, however: Kentucky's judicial elections are nonpartisan because they have no party primaries and the candidates are not identified by any party on the ticket, *see Carey*, 614 F.3d at 202–03.  From what the Court can tell, this might be what the Commission means, as it states: "the current version of Canon 5(A)(1)(a) is not used to advance the compelling interest in an impartial judiciary, but instead is used to uphold the Kentucky Constitution's requirement that judicial races remain non-partisan."  R. 37 at 14.  The Kentucky Constitution mandates that judicial elections will be on "a nonpartisan basis as provided by law."  Ky. Const. § 117.  Kentucky law excludes any "party designation or emblem of any kind" and "any sign indicating any candidate's political belief or party affiliation" on the ballots for judicial elections.  Ky. Rev. Stat. Ann. § 118A.060(8).

With such a fine interest, however, Canon 5(A)(1)(a) is not "actually necessary to" achieve that interest.  *Brown*, 131 S.Ct. at 2738; *see United States v. Alvarez*, 132 S.Ct. 2537, 2549 (2012) (plurality opinion) (requiring a "causal link between the restriction imposed and the injury to be prevented" to satisfy strict scrutiny).  No candidate's speech can change the fact that Kentucky's judicial elections do not rely on the party system.  And the Commission offers no argument or evidence as to how Canon 5(A)(1)(a) is necessary to a nonpartisan election.  Like the plaintiff in *Carey*, Blau does not argue that a nonpartisan primary or the absence of "R" or "D" on the ballot is unconstitutional.  614 F.3d at 203.  Those facets of Kentucky judicial elections remain unaffected by Canon 5(A)(1)(a).  Because speech cannot impact that interest, it "undermines the Commonwealth's professed need to suppress speech in the process." *Id.* at 203.

### d.  Misleading Speech and Strict Scrutiny

The Commission responds that the Court has it all wrong because it interprets the Canon too broadly:  Canon 5(A)(1)(a) does not prohibit party affiliation at large, but bans only speech that misleads voters into thinking that a candidate is the party nominee and that the election is partisan.  *See* R. 55 at 5 (Commission may preclude candidates "from giving the false impression that they are the party nominee in a partisan race.").  A candidate who says he is the Republican candidate, the argument goes, implies that he was the winner of a primary.  Voters will think that a partisan primary took place (even though they never voted in one) and that the election must be partisan as a result.  It is that speech that the Canon proscribes.  Under that interpretation, the Commission argues, Canon 5(A)(1)(a) is neither overbroad nor underinclusive.

Even if the Court could see the Commission's interpretation in the fog of Canon 5(A)(1)(a), the interpretation still fails strict scrutiny.  Stripped down to its essence, the Commission's position is that the Court should uphold a ban on one type of misleading political speech.  But the remedy for misleading speech is more speech, not less.  *See Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."); *Alvarez*, 132 S.Ct. at 2550 (plurality opinion) ("The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth.").  And this makes sense.  Often, whether a statement is misleading is in the eyes of the beholder.  Take Kentucky native Muhammad Ali's statement, "I am the greatest."  At the time he said it, many believed it to be true.  But would Joe Frazier have thought it misleading?  Of course.  And, take, for

example, a judicial election between two Republicans.  If one judicial hopeful says, I am the best Republican for the job, would censorship or more speech better serve the public?  The answer is more speech.  Our Founders wisely left to the public—not to the government—the weighty determination of whether political speech is true or misleading.  *See Whitney*, 274 U.S. at 375–76 (Brandeis, J., concurring).  Even false statements, which are "inevitable in free debate," especially political debate, must have some protection so that freedom of speech has the "breathing space" necessary "to survive."  *Brown v. Hartlage*, 456 U.S. 45, 60 (1982) (internal quotation marks omitted).  Misleading statements, therefore, deserve shelter under the First Amendment.

Blau does not want to make false statements; nor does he intend to intentionally mislead the voters into thinking he won a primary.  He is a candidate for judicial office, he is a Republican, and he is the last Republican in the race.  No one contests that it would be correct grammar, and a true statement, to say he is "the only Republican candidate," or "a Republican candidate," and his opponent is "the only Democratic candidate" or "a Democratic candidate."  Nonetheless, the Commission wants to prohibit that truthful speech out of concern that voters will be confused.  Because there are "less restrictive alternatives that would be at least as effective," this type of paternalism is invalid.  *Reno*, 521 U.S. at 874.

There are several ways to correct the supposed misimpression with voters without suppressing speech.  First, the Commission, or some other arm of Kentucky, could send out mailers, post online, or walk door-to-door to inform Kentuckians that judicial elections are nonpartisan.  Second, the Canons could require candidates, if they disclose party affiliation, to affirmatively state that elections are nonpartisan.  *Cf.* 47 U.S.C. § 315(b)(2)(C) (requiring "a clearly readable printed statement, identifying the candidate and stating that the candidate

has approved the broadcast and that the candidate's authorized committee paid for the broadcast").  Third, the election ballots could remind voters that no candidate has won a partisan primary or been nominated by any party.  Because the Commission "has not shown, and cannot show, why counterspeech would not suffice to achieve its interest," its narrow interpretation also fails strict scrutiny.  *Alvarez*, 132 S.Ct. at 2549 (plurality opinion).

No matter whether the Court interprets Canon 5(A)(1)(a) broadly or narrowly, or whether it defines the Commission's interest expansively or finely, Canon 5(A)(1)(a) fails strict scrutiny.

### 2.  Canon 5(B)(1)(c)

Under Canon 5(B)(1)(c), in relevant part, a judicial candidate shall not "knowingly, or with reckless disregard for the truth, misrepresent any candidate's identity, qualifications, present position, or make any other false or misleading statements."  The Commission draws a distinction between Canon 5(B)(1)(c) and Canon 5(A)(1)(a), but, as a matter of the First Amendment, there is none.  Just like its counterpart, there is a strong likelihood that Canon 5(B)(1)(c)'s prohibition on misrepresenting and misleading statements is unconstitutional.[4]

The Commission claims that the Canon's prohibition on misleading statements is narrowly tailored to Kentucky's compelling interest in maintaining an impartial judiciary.  *See* R. 30 at 13.  Regardless of whether the interest is nonpartisan elections or an impartial judiciary, Canon 5(B)(1)(c)'s ban on misleading speech must still pass strict scrutiny.  For many of the same reasons discussed as to Canon 5(A)(1)(a), Canon 5(B)(1)(c) fails strict scrutiny.

---

[4] The Court does not reach the issue of whether the ban on making false statements, either knowingly, or with reckless disregard for the truth, is constitutional.

First, the Canon, as applied to misleading speech and misrepresentations, is substantially overbroad.  The Canon would prohibit a whole host of possibly misleading speech that is constitutionally protected.  *See supra*. To revisit our earlier discussion, take Muhammad Ali's statement and now put it in the political election:  "I am the greatest candidate" and "My opponent is the worst/a bad/the wrong candidate."  Are those statements misleading?  It depends on who is hearing them and what they believe.  Could a voter be misled by that speech?  Maybe.  Could a government commission find it misleading?  Of course.  And again in our hypothetical race between two Republicans, one might say "I'm a real Republican" or "I have true conservative values."  The candidate might claim his opponent "is not like you and me" or "is not a friend of the middle class."  All of that speech could be misleading, and all of it is constitutionally protected.  *See Hartlage*, 456 U.S. at 60–61; *Weaver v. Bonner*, 309 F.3d 1312, 1320 (11th Cir. 2002) (holding that Georgia Judicial Canon was not narrowly tailored because "by prohibiting false statements negligently made and true statements that are misleading or deceptive, [it] does not afford the requisite 'breathing space' to protected speech").

Second, precluding misleading speech is not "actually necessary" to achieve any of the Commission's claimed interests.  If the asserted interest is in maintaining an impartial judiciary, then *Republican Party of Minnesota v. White* guides the course.  The Supreme Court recognized that impartiality was a compelling interest when it referred to a "lack of bias for or against either *party* to the proceeding."  536 U.S. at 775.  It rejected impartiality as a compelling interest if it meant "preconception in favor of or against a particular *legal view*."  *Id.* at 776.  And the Supreme Court left open whether impartiality as "open-mindedness" was a compelling interest.  *Id.* at 778.

22

Under the first definition of impartiality—bias against a party—Canon 5(B)(1)(c)'s prohibition on misleading speech is not narrowly tailored to serve that interest because "it does not restrict speech for or against particular *parties*." *White*, 536 U.S. at 776. In fact, the Canon restricts speech that has nothing to do with legal issues or how a judge might rule, because it reaches all misleading speech. Assuming the "open-mindedness" interest is a compelling one, the Canon suffers from all the same problems. Under this view, a judge must "be willing to consider views that oppose his preconceptions, and remain open to persuasion, when the issues arise in a pending case." *Id.* at 778. But the Commission has no argument for how misleading speech is in any way related to the fact or appearance of judicial open-mindedness. Indeed, if the public believes that a candidate has attempted to mislead it, that will give the public more insight into the candidate, not less. Insight we would want the public to have before selecting a judicial candidate.

Finally, if the interest is a nonpartisan election, then Canon 5(B)(1)(c) suffers from the same maladies as Canon 5(A)(1)(a), but only worse. The Court has already concluded that it is unconstitutional to ban election speech that might mislead voters into thinking the election is partisan. Canon 5(B)(1)(c) spreads its wings much further. It prohibits all misleading speech. But banning misleading speech, including speech unrelated to a nonpartisan election, is not necessary to maintain a nonpartisan election.

The Supreme Court has "never allowed the government to prohibit candidates from communicating relevant information to voters during an election." *White*, 536 U.S. at 782. Saying "I am the only Republican candidate" conveys to voters that the individual is a candidate, a Republican, and the last Republican in the race. While it may also suggest that

the candidate is the nominee, the answer to that problem is additional speech.  Thus, there is a strong likelihood that Canon 5(B)(1)(c) is unconstitutional.

### B.  Irreparable Harm

The next factor for a preliminary injunction is whether Blau would suffer irreparable harm absent the injunction.  When First Amendment rights are at stake, the loss of those freedoms "unquestionably constitutes irreparable injury."  *Platt*, 2014 WL 5002078, at *4 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  Election day is fast-approaching, and without a preliminary injunction Blau would risk sanctions from the Commission for his mailers.  So, the Court finds that Blau would suffer irreparable harm without the preliminary injunction.

### C.  Substantial Harm to Others

A potential harm is that voters may be misled into thinking the election is partisan. That harm is not likely a substantial one as the voters benefit from the extra information. Regardless, even if this factor slightly favored the Commission, it is outweighed by the other preliminary-injunction factors.

### D.  Whether the Public Interest would be Served

When the rights at issue come within the First Amendment, courts have steadfastly held that "there is no public interest in enforcing a law that curtails debate and discussion regarding issues of political import."  *Suster v. Marshall*, 149 F.3d 523, 533 (6th Cir. 1998) (quoting *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, Cal.*, 454 U.S. 290, 299 (1981)); *see also G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").  As a result, the injunction serves the public interest.

## CONCLUSION

Balancing the preliminary injunction factors weighs in favor of granting the injunction.   Accordingly, the Court **GRANTS** the temporary restraining order and preliminary injunction, R. 46.   The order and injunction prohibit the enforcement of the Kentucky Code of Judicial Conduct Canon 5(A)(1)(a) in its entirety and Canon 5(B)(1)(c), as it relates to "misleading" speech.

This the 29th day of October, 2014.

Signed By:

_Amul R. Thapar_

United States District Judge