UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
COVINGTON

| | | |
|---|---|---|
| ROBERT A. WINTER, JR., | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 14-119-ART |
| | ) | |
| and | ) | |
| | ) | |
| CAMERON A. BLAU and HON. | ) | **MEMORANDUM OPINION &** |
| ALLISON JONES, | ) | **ORDER** |
| | ) | |
| Intervenor Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HON. STEVEN D. WOLNITZEK, *in his* | ) | |
| *official capacity as Chair, Judicial* | ) | |
| *Conduct Commission*, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This case sits at the confluence of two First Amendment streams. In one line of cases, the Supreme Court has made clear that restrictions on political speech are almost always unconstitutional.[1] The reason is that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). In the other line, however, the Court has made clear that a state may nevertheless regulate the political speech of judges and judicial candidates. The reason is that judges and politicians are different species of public officials: politicians are supposed to be responsive to

---

[1] *See, e.g.*, *Snyder v. Phelps*, 562 U.S. 443, 452 ("The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'") (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964).

their constituency, but judges are supposed to be "responsive" to the law alone.[2]  Thus, even when a state chooses to elect its judges, the Court has held that the state need not allow the election contest to proceed no-holds-barred.

The question presented is whether six canons of the Kentucky Judicial Code of Ethics violate the First Amendment.[3]  All of the canons prohibit political speech based on its content, and thus strict scrutiny applies.  The more specific questions, then, are whether the canons advance compelling governmental interests and, if so, whether they are narrowly tailored toward promoting those interests.

## I.   Factual background

Like many states, Kentucky holds judicial elections.  These elections are "nonpartisan," *i.e.*, the ballot does not reveal a candidate's political party and candidates need not win a party primary to appear on the ballot.  *See* Ky. Const. § 117 ("Justices of the Supreme Court and judges of the Court of Appeals, Circuit and District Court shall be elected from their respective districts or circuits on a nonpartisan basis as provided by law.").  Instead, Kentucky has one primary election featuring all of the interested candidates; the two with the most votes then proceed to the general election.  Ky. Rev. Stat. Ann. § 118A.060.  Thus, in a bluegrass judicial-election bout, the undercard will likely feature candidates from a variety of political parties.  And the main event might pit a Democrat against a Democrat or a Republican against a

---

[2] *See e.g.*, *Williams-Yulee v. Fla. Bar.*, 135 S. Ct. 1656, 1667 ("In deciding cases, a judge is not to follow the preferences of his supporters[.]").
[3] The Canons in question are 5(A)(1)(a), 5(A)(1)(b), 5(A)(1)(c), 5(A)(4), 5(B)(1)(c), and part of 5(A)(1)(d).  One of the plaintiffs, Cameron Blau, had originally challenged Canon 5(B)(2) and another part of 5(A)(1)(d).  But the Supreme Court upheld nearly identical provisions in *Williams Yulee*, so Blau dropped his challenge with respect to those canons.  *See* R. 94-1 at 12 n.6.

Republican.  Notwithstanding the candidates' true affiliations, however, these partisan labels appear nowhere on any of the ballots.

In addition to these technical rules governing the elections themselves, the Kentucky Supreme Court's Code of Judicial Conduct regulates what judicial candidates may say while campaigning.  The Kentucky Judicial Conduct Commission ("Commission") enforces those rules, called Canons, and punishes violations.  *See* Ky. Const. § 121; Rule of Supreme Court of Kentucky 4.020(1)(b)(v) (explaining that the Commission can impose, among other sanctions, "admonition, private reprimand, public reprimand or censure" for violations of the Code of Judicial Conduct).

## A.

In July 2013, Kentucky Governor Steven Beshear appointed Allison Jones to the Kentucky Court of Appeals.  R. 72-2 at 1.  She filled a vacancy left by Judge Michelle Keller, whom Beshear had appointed to the Kentucky Supreme Court.  *Id.*  The term of the vacancy ended 2014, however, and thus Jones needed to win an election to keep her seat.  *Id.*  Most of the time, Jones's campaign used the word "keep" to describe what voters should do with respect to Jones.  For example, the campaign formed a "Committee to *Keep* Judge Jones" and used a "*Keep* Judge Jones" logo on campaign materials.  *Id.* at 3.  But sometimes Jones used the word "re-elect."  For example, she occasionally urged voters to "re-elect" her to another term.  *Id.*

Jones also told voters what she planned to do if elected.  In particular, she told them that she would make it a priority of hers to fight the heroin epidemic that has plagued Kentucky in recent years.  In support of that goal, she "stated in campaign materials that one of [her]

priorities was to continue to work with the legislative and executive branches to ensure that the law provides for stiff penalties for heroin dealers." R. 72-2 at 7.

Finally, Jones sometimes urged "re-election" and promised to promote stiff heroin sentences at the same time. For example, the *Courier Journal*'s voter guide included a statement from Jones that "[i]f re-elected to the Court of Appeals, I will continue to work with the legislative and executive branches to ensure that the law provides stiff penalties for heroin dealers and that the judiciary has the tools necessary to reduce recidivism among heroin addicts that are arrested and sentenced." *Id.* ¶ 24. Jones ultimately won the election with 61% of the vote. *Id.* ¶ 4.

After the election, Jones received a letter advising her that "a complaint ha[d] been filed against [her] with the Judicial Conduct Commission relative to [her] campaign for election to the Court of Appeals." *Id.* at 7. According to the letter, the complaint alleged that Jones had "violated the Code of Judicial Conduct by making false and misleading statements in speeches and campaign materials by asking voters to re-elect [her] even though [she was] not elected to the position but rather, [was] appointed by Governor Beshear." *Id.* The complaint also apparently alleged that Jones had "violated the Code when [she] stated in campaign materials that one of [her] priorities was to continue to work with the legislative and executive branches to ensure that the law provides for stiff penalties for heroin dealers." *Id.* The Commission advised Jones that it had "consider[ed] and discuss[ed] the complaint," and later asked her to "file a written response to the allegations." *Id.* After receiving the letter, Jones contacted the Commission and asked for "additional details." *Id.* ¶ 9. The Commission refused to provide her "with any details beyond those set forth in the letter." *Id.*

**B.**

4

In May 2014, Robert Winter was running for the position of Circuit Judge in Kentucky's 16th District. R. 31-3 ¶ 3. During the primary campaign for that seat, Winter sent out several sets of mailers. Some of the mailers were indeed "targeted" toward Republicans, though they hardly qualified as partisan screeds. For the most part, the mailers emphasized Winter's impartiality, legal experience, and military service—they included, for example, information about Winter's career as an officer in the United States Navy and photographs of Winter reviewing legal documents. *See, e.g.*, R. 1-3; R. 1-4; R. 1-6; R. 1-8. The tagline on many of the mailers was "Experienced, Impartial, Veteran," *see, e.g.*, R. 1-8 at 2, and the mailers often urged voters to elect as judge a "highly rated attorney and military veteran." R. 1-6 at 1. They emphasized Kenton County's conservative values and promised that, if elected, Winter would "protect Kenton County's Conservative values by making all decisions based on the law." R. 1-4 at 2. Perhaps channeling the spirit of Chief Justice John Roberts, Winter promised in the mailers to "hear the case just as an umpire does with a baseball game," to "call balls and strikes based on the law." R. 1-5 at 2. "You will be electing a judge," the mailers said, "not someone who pre-judges. I have no agenda or preconceived notions." R. 1-3 at 1.

The mailers also included some detail about the political parties to which Winter and his opponents belonged. *See, e.g.*, R. 1-8 at 2. Under any fair reading, however, these party-affiliation statements were hardly the mailers' primary focus. After all, many of the mailers included full-color photographs of ballistic-missile submarines. *E.g.*, R. 1-3; R. 1-4; R. 1-6. Juxtaposed next to such images, boilerplate language about party affiliation tends not to capture the reader's attention. Even so, several of the mailers did identify Winter as a registered Republican and identified some of his opponents as registered Democrats. *See, e.g.*,

*id.* at 1; R. 1-5 at 1.  According to Winter, all of the party-affiliation language was truthful.  He of course knew his own party affiliation; to determine his opponents', he "specifically checked public records, including the voter registration list, to confirm the affiliations."  *Id.*

After the election, three unidentified people sent formal complaints to the Commission. The first complaint alleged that Winter had "mailed campaign literature in which he not only identifies himself as a lifelong Republican, but also identifies three of his opponents as Democrats."  R. 29-1 at 2.  In the complainants' view, the mailers were evidence that Winter was "running his campaign as a member of a political organization" and "trying to capitalize on the expected heavy turnout of Republican voters to help him in his 'non-partisan' race."  *Id.* at 3.  Such conduct, the complaint went on to allege, violated Canon 5 as well as the "spirit" of the Kentucky Constitution, which provides that judges "shall be elected . . . on a non-partisan basis."  *Id.* (quoting Ky. Const. § 117).  "Why else would [Winter] identify himself as a Republican and his opponents as Democrats," the complaint asked, "if he were not running a partisan campaign?"  *Id.*

The other complaints struck a more passive-aggressive tone.  The second complainant merely "question[ed]" whether one of the mailers "violate[d] Canon 5 about political conduct by judicial candidates" and asked for "clarification" about "whether such conduct is permissible."  R. 29-2.  The third complaint was sent directly to the Chief Justice of Kentucky, John Minton, and pointed out that Winter's mailers "refer[red] to partisan politics by identifying Mr. Winter as a Republican . . . [and] identif[ying] the other candidates as his democratic opponents."  R. 29-3.  Enclosed were two of the mailers.  *Id.*  "I would just ask that our Supreme Court look into this matter," the complaint concluded.  *Id.*

6

A month or so later, the Commission sent Winter a letter.  R. 1-9.  Therein, the Commission advised Winter of these three complaints.  *Id.* at 1.  According to the Commission's letter, the complaints alleged that Winter had "campaign[ed] as a member of a political organization in violation of Canon 5(A)(1)(a)"—which prohibits a judicial candidate to "campaign as a member of a political organization"—"by not only identifying [himself] as a Republican but also by identifying [his] opponents as Democrats." *Id.*  The complaints also alleged, according to the letter, that his campaign materials had given "the false impression that the election was a partisan one," thus violating Canon 5(B)(1)(c), which prohibits a judicial candidate from making "false or misleading statements."[4]  Winter responded to these allegations by filing this lawsuit.  *See* R. 1.

In his complaint, Winter says that he intends to run for Kenton District Judge in 2018. R. 31-3 ¶ 5.  He says that he would like to file a letter of intent with the Kentucky Registry of Election finance but has refrained from doing so yet.  *Id.*  The reason for the delay, he says, is that he wants to "announce his party affiliation and that of other candidates" when he files with media outlets.  But he fears "making such announcements given the current situation." *Id.* Nevertheless, Winter does plan to identify his party affiliation (and that of his opponents) in the 2018 election. *Id.* ¶ 6.  His goal in doing so, Winter says, would be to "try to garner support from the Kenton County Republican Party Executive Committee and other Republican Party groups." *Id.*

### C.

---

[4] Although the Commission's letter stated that the *complaints* alleged a Canon 5(B)(1)(c) violation, in fact that allegation seems to have come from the Commission itself rather than the complainants.  All three complaints suggest—at least when read broadly—that Winter improperly campaigned as a member of a political organization. But none of them suggested that his mailers had included false or misleading statements.

That same year, *i.e.*, 2014, Robert Blau ran for District Judge in Kentucky's 17th Judicial District.  R. 46-2 ¶ 3.  His opponent in that race was the incumbent District Court Judge, Gregory Popovich.  R. 46-2 ¶ 5.  Popovich himself was a registered Democrat; most of his donors and endorsers were Democrats as well.  R. 46-2 ¶¶ 5–7.  During the campaign, Blau wished to send out campaign literature "accurately identifying [his] lifelong conservative Republican affiliation, as well as Judge Popovich's lifelong liberal Democrat affiliation."  *Id.* ¶ 11.

Blau also wanted to seek endorsements from Republican officials in his home county.  R. 46-2 ¶ 12.  Blau says he wanted to seek an endorsement from the party itself and help the party hold fundraisers.  *Id.* ¶ 13.  But he did not do so, he says, because he was scared that such actions would be considered "holding office" within the Republican Party, something the Code of Judicial Conduct prohibits.  *Id.* ¶ 18.  Finally, Blau says that he would like to donate to his fellow Republicans in Campbell County, but the Code prohibits judicial candidates from making donations to candidates or political organizations.  *Id.* ¶ 15.

### D.

In October 2014, Blau moved to intervene in the suit that Winter filed.  R. 43.  The Court granted that motion.  R. 48.  In January 2015, Jones also filed a motion to intervene.  R. 72; R. 73.  The Court granted that motion as well.  R. 74.  In her intervening complaint, Jones challenged Canon 5(B)(1)(c), which provides, in relevant part, that a judge or candidate for election to judicial office:

> Shall not, in connection with cases, controversies or issues that are likely to come before the court, make pledges, promises, or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office; and shall not knowingly, or with reckless disregard for the truth . . . make any . . . false or misleading statements.

8

Specifically, Jones challenged two clauses of the Canon: the one that forbids "false or misleading" statements, and the one that forbids "pledges, promises or commitments." She argued that both clauses were facially unconstitutional. She also argued that both clauses were unconstitutional as applied to her.

In February 2015, the Court certified three questions of law to the Kentucky Supreme Court. R. 79. With respect to Canon 5(A)(1)(a), the Court asked what it meant to "campaign[] as a member of a political organization," both as an abstract matter and as applied to a few specific factual contexts—for example, whether the statement "I am the only Republican candidate for judge" would count. *Id.* at 5. With respect to Canon 5(B)(1)(c), the Court asked what it meant to act as a leader or officer in a political organization and whether one would act as a leader or an officer by agreeing to host events for a political party. *Id.* Finally, with respect to Canon 5(A)(1)(c), the Court asked for guidance as to what constituted a "false statement" and asked specifically whether Jones's use of the term "re-elect" was such a statement. *Id.*

In November 2015, the parties filed dueling motions for summary judgment. *Compare* R. 92, *with* R. 94. Three months after the parties filed their motions, the Kentucky Supreme Court answered the questions that this Court had earlier certified. R. 117-1. The Court then ordered the parties to file briefs stating their views on how the certification opinion affected their earlier motions. R. 119. Both parties did so. R. 120; R. 121. The parties' summary-judgment motions, R. 94 (plaintiffs' motion for summary judgment); R. 92 (defendants' motion for summary judgment), and the plaintiff's motion for a permanent injunction and declaratory relief, R. 94, are now before the Court.

## II. Discussion

### A.  Legal standards

A court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is a genuine dispute as to material fact if the record "taken as a whole" could "lead a rational trier of fact to find for the non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  When reviewing the record for summary-judgment purposes, the court must draw all reasonable inferences in favor of the non-moving party.  *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).

Here, the plaintiffs and the defendants make purely legal arguments: the plaintiffs argue that the various canons are unconstitutional; the defendants argue that they are not.  Thus, if the canons are unconstitutional, then a "rational trier of fact" could find only for the plaintiffs, and the plaintiffs are therefore entitled to summary judgment in their favor.  *Matsushita*, 475 U.S. at 587.  If the canons are constitutional, on the other hand, then a "rational trier of fact" could find only for the defendants, and the defendants are therefore entitled to summary judgment in their favor.  *Id.*

To obtain a permanent injunction, a plaintiff "must satisfy a four-factor test."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Specifically, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering

the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*  In constitutional cases, however, the analysis is a bit simpler: "[a] party is entitled to a permanent injunction if it can establish that it suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998)).  And in a First Amendment case like this one, things are simpler still.  For "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

In sum, if the canons are unconstitutional, then the plaintiffs are entitled to summary judgment and are likewise entitled to a permanent injunction.  If the canons are constitutional, however, then the defendants are entitled to summary judgment and the plaintiffs are not entitled to a permanent injunction.  The only question before the Court, then, is whether the six challenged canons are compatible with the First Amendment.  The Court will therefore consider each canon in turn.

## B.  Canon 5(A)(1)(a)

Blau and Winter argue that the Court should strike down Canon 5(A)(1)(a), which prohibits judicial candidates from "campaign[ing] as a member of a political organization." Ky. Sup. Ct. R. 4.300, Canon 5(A)(1)(a).

As an initial matter, the Commission argues that Winter lacks standing to challenge this Canon.  To have standing, a plaintiff must suffer an injury in fact—*i.e.*, a harm that is "concrete and particularized" as well as "actual or imminent" rather than "conjectural or hypothetical."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  In a First Amendment case, a plaintiff can establish injury-in-fact by showing that the threat of an enforcement action against his speech is sufficiently imminent.  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014).  He need not show actual or threatened prosecution.  *See McGlone v. Bell*, 681 F.3d 718, 729 (6th Cir. 2012) ("Plaintiffs may have standing even if they have never been prosecuted or threatened with prosecution.").  But a plaintiff must show that he intended to engage in actions "arguably affected with a constitutional interest," that a legal provision "arguably" prohibits these actions, and that there is a "credible threat" of prosecution.  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see also Driehaus*, 134 S. Ct. at 2342.  A threat is a "credible" one if a person must "censor himself" to avoid violating the law in question.  *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 452 (6th Cir. 2014) (citing *Carey v. Wolnitzek*, 614 F.3d 189, 201 (6th Cir. 2010)).

The Commission argues that Winter has not shown a credible threat of prosecution because the Commission has not yet ordered him "to halt any present activity or warn[ed] against any future conduct."  R. 100 at 7.  But Winter has provided specific evidence that the Canon has been enforced in the past against someone engaged in similar behavior.  R. 107-1.  He has presented evidence that the Commission has instituted sanctions proceedings in the past against at least one candidate who did the same thing.  R. 60 at 4–8.  He has declared his intent to engage in future conduct that the Canon arguably prohibits—namely identifying himself as "the Republican candidate."  And the Kentucky Supreme Court has now made clear in its certification opinion that "a campaign representation such as 'I am *the* Republican candidate [for judicial office]'" would indeed violate Canon 5(A)(1)(a).  *Blau v. Wolnitzek*,

2015-SC-000086 at 14 (Ky. Feb. 18, 2016).  Winter apparently wishes to make exactly that kind of "campaign representation"—as well as other similar ones—and thus he will need to "censor himself" in the future "to avoid violating" the Canon.  *Platt*, 769 F.3d at 451 (6th Cir. 2014).  He has therefore shown a credible threat of prosecution and thus has standing to challenge Canon 5(A)(1)(a).

Turning to the merits, the First Amendment provides that Congress "shall make no law . . . abridging the freedom of speech."  U.S. Const. amend I.  The Fourteenth Amendment has made that restriction binding on states like Kentucky as well.  *See Stromberg v. California*, 283 U.S. 359, 368 (1931).  When a law restricts speech on the basis of content, as this Canon does, the law is unconstitutional unless it passes strict scrutiny.  *See, e.g.*, *Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002).

Last term, the Supreme Court made clear that strict scrutiny is the proper analysis even in judicial-elections cases.  *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1665 (2015).  Thus, the question presented is as follows: is Canon 5(A)(1)(a) "narrowly tailored to serve a compelling [governmental] interest?"  *Id.*  The Commission has the burden to answer that question.  *White*, 536 U.S. at 774–75 ("Under strict scrutiny review, the government has the burden to prove that the constraints on speech are supported by a compelling governmental interest and are narrowly tailored, such that the statutory effect does not prohibit any more speech than is necessary to serve the governmental interest.").

In support of its argument that the answer is "yes," the Commission identifies one interest: an interest in "diminishing the reliance on political parties in judicial selection." R. 100 at 10.  The Sixth Circuit has held that such an interest is a "compelling" one.  *Carey*,

614 F.3d at 201.  Thus, the question presented is whether Canon 5(A)(1)(a) is narrowly tailored toward advancing that interest.

Before the Court can answer that question, however, it must pause to address one interpretive wrinkle.  Federal courts must defer to a state supreme court on questions of state law.  *See, e.g.*, *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 412 (1992) ("Where a state court has interpreted a provision of state law, we cannot ignore that interpretation, even if it is not one that we would have reached if we were construing the statute in the first instance.").  And here the Kentucky Supreme Court has interpreted Canon 5A(1)(a) in its certification order.  Asked what the canon meant by "campaigning as a member of a political organization," the Kentucky court responded that the phrase meant—and meant only—"suggesting to the voters that the candidate is the endorsed *nominee* of a political party."  *Blau*, 2015-SC-000086 at 14 (emphasis added).

In Kentucky judicial elections, of course, political parties do not endorse any nominees at all.  Thus, in the Kentucky Supreme Court's view, "representing [one's self] as the nominee of a political party" is, "by any standard, blatantly false."  *Id.*  In short, the Kentucky Supreme Court has interpreted Canon 5(A)(1)(a), which prohibits "campaigning as a member of a political organization" as nothing more than a specific application of Canon 5(B)(1)(c), which prohibits "false and misleading statements."

If the only thing the Canon forbid was a candidate saying that he is a party's official nominee, then it would likely be constitutional.  After all, Kentucky has a compelling interest in promoting non-partisan elections.  *Carey*, 614 F.3d at 201.  And a candidate would of course

14

frustrate that purpose if he claimed to be a party's official nominee.[5]  Thus, even under strict scrutiny, the Canon would likely survive if it forbid a candidate to say that he is a party's official nominee—and forbid nothing more.

Unfortunately for the defendants, the Kentucky Supreme Court has interpreted the Canon more broadly than that.  The Court then went on to apply Canon 5(A)(1)(a) to other specific factual settings.  A candidate violates the Canon, the Court held, when he says that he is "the" Republican candidate, that he is "the Conservative Republican" candidate, that his opponent is "the" Democratic candidate, or that his opponent is "the Liberal Democrat" candidate.  *Id.* at 15–16.   According to the state court, each of these statements implies that the Republican or Democratic parties had formally nominated a certain candidate.  A candidate apparently does not violate the canon, however, when he says that he is "the only" Republican or that his opponent is "the only" Democrat.  Each of those statements, the Kentucky Supreme Court held, implies nothing about whether a given party had nominated a given candidate.  *Id.* After discussing these specific factual settings, the Kentucky Supreme Court concluded that the Canon forbids candidates to "portray themselves, either directly or by implication, as the official nominee of a political party."  *Id.* at 16.

The Court must give the Canon the Kentucky Supreme Court's interpretation.  Thus, instead of analyzing the text of the Canon itself, the Court must imagine that the Canon reads as follows: "a candidate shall not portray himself, either directly or by implication, as the official nominee of a political party."  As explained above, when construed in this way, most

---

[5] As discussed in greater detail below, such a Canon would also probably be constitutional as an effort to prevent judges and judicial candidates from lying.

of the Canon is completely unobjectionable, *i.e.*, Kentucky of course may prohibit a candidate from portraying himself as the official nominee if he does so "directly."

The problem lies in the three words: "or by implication." Specifically, the problem is that those words are too vague. A law is vague if it "fails to provide fair notice to those to whom it is directed." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048 (1991) (internal quotation marks omitted). To determine whether a law provides such notice, the test in most contexts is whether a law "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972)).

In the free-speech context, however, the "standards of permissible statutory vagueness" are even stricter. *NAACP v. Button*, 371 U.S. 415, 433 (1963). The freedom of speech is "delicate and vulnerable, as well as supremely precious in our society . . . [and] the threat of sanctions may deter [speech] almost as potently as the actual application of sanctions." *Id.* A content-based regulation is therefore not narrowly tailored—*i.e.*, it is unconstitutional—if it is too vague. *See City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987); *see also Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871 (1997). "The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech." *Reno*, 521 U.S. at 871–72.

Moreover, vague laws give authorities discretion to enforce the law against one speaker but not others, thus creating the "risk of discriminatory enforcement." *Id.* at 872 (citing *Denver Area Ed. Telecomms. Consortium, Inc. v. FCC*, 518 U.S. 727 (1996)). "Such discretion is particularly repugnant given the eternal temptation . . . to arrest the speaker rather than to correct the conditions about which he complains." *Hill*, 482 U.S. at 465 n.15 (internal

16

quotation marks omitted). In short, "First Amendment freedoms need breathing space to survive," and thus the "government may regulate in the [free-speech] area only with narrow specificity." *Id* at 433 (citation omitted).

When looking for adjectives to describe Canon 5(A)(1)(a),[6] the words "narrowly specific" do not spring immediately to mind. A professional linguist would struggle to determine exactly what it means to "portray" one's self as an official nominee "by implication." And a "person of ordinary intelligence?" Good luck to him. For example, could a candidate say "Republicans support my candidacy?" Could he say "the Republican leadership has endorsed me?" Could he say "the Republican party wants me to be elected?" Are these statements more like "affiliating" with the Republican party (which the Canon apparently permits) or more like "implying" that one is the party's official nominee (which the Canon apparently forbids)? This Court confesses that it does not know the answer to that question.

The Kentucky Supreme Court's interpretation of the statute does not solve this problem. For example, we now know that, when one says "I am *the* Republican candidate," one "implies" that he is the "official nominee." The Kentucky Supreme Court held exactly that. Without that specific holding, however, an ordinary person might have thought that "I am the Republican candidate" meant simply that the candidate was the only Republican candidate left standing in the race. Similarly, we now know that, when one says "I am the Conservative Republican candidate," one likewise implies that he is the official nominee. (The word "Conservative" is, according to the Kentucky court, mere "surplusage," which does "nothing

---

[6] As interpreted by the Kentucky Supreme Court.

to dispel the implied falsehood that the candidate is running for Kentucky judicial office as the formal candidate of the Republican Party." *Blau*, 2015-SC-000086 at 15). Again, however, an ordinary person might have thought that "I am the Conservative Republican candidate" merely meant that "there are lots of the Republicans in the race and many of them are more liberal than I am." This is, after all, an equally plausible interpretation.

Thus a string of hypotheticals spring to mind: "I am the Kenton County Conservative Republican candidate"; "I am the Kentucky-born Conservative Republican Candidate"; "I am the smartest Kentucky-born Conservative Republican Candidate." Are any of these statements permitted? Which modifiers are mere "surplusage" and which instead "dispel the implied falsehood that the candidate is running for Kentucky judicial office as the formal candidate of the Republican party?" The modifier "only" is apparently good enough; after all, the Kentucky Supreme Court held that a candidate could lawfully claim to be "the only Republican candidate." But might some other modifiers suffice as well? The Canon itself—as construed by the Kentucky Supreme Court—provides little guidance.

To be clear, the point is not that the Kentucky Supreme Court Justices wrongly interpreted the Canon in these specific factual contexts. After all, the law of the Commonwealth is theirs to interpret. If they say that under Kentucky law "arson" means "whale hunting," then whale hunting is what arson means. The point is simply that their application of the Canon to specific factual contexts highlights just how vague the Canon itself really is—and how arbitrary any enforcement of the Canon would be. With this Canon hanging above him, in Damoclean fashion, a candidate would need to be courageous indeed to say anything at all about his political affiliation. And that is a real problem given that the Sixth Circuit has held that a judicial candidate has a right—a constitutional right—to tell the

18

voters that a given party is *his* party, *Carey*, 614 F.3d at 201.[7]  For these purposes, however, all that need be said is this: even as narrowed by the Kentucky Supreme Court, the Canon fails to "give [a] person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Hoffman*, 455 U.S. at 498 (citing *Grayned*, 408 U.S. at 108–09).   The Canon is therefore unconstitutionally vague.[8]

### C.  Canon 5(A)(1)(c)

Blau asks the Court to invalidate Canon 5(A)(1)(c), which provides that judicial candidates shall not "make speeches for or against a political organization or candidate or publicly endorse or oppose a candidate for public office."  That request is easily granted as to the first clause of the Canon, *i.e.*, the clause forbidding speeches "for or against a political organization or candidate."  As the Sixth Circuit held in *Carey*, a state cannot constitutionally prevent a judge or judicial candidate from "identifying" himself as a member of a political party.  614 F.3d at 203–04.  The Circuit admitted that "party affiliation may not be a reliable indicator of the qualities that make a good judge," but noted that "[i]t is simply not the function of government to select which issues are worth discussing or debating in the course of a

---

[7] *See also Williams-Yulee*, 135 S. Ct. at 1673 ("Judicial candidates have a right to speak in support of their campaigns.").

[8] One might respond that the Kentucky Supreme Court's certification opinion nullifies any vagueness challenge.  After all, the United States Supreme Court has made clear that "[a] plaintiff who engages in some conduct that is clearly prescribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2719 (2010) (internal quotation marks omitted).  And the Kentucky Supreme Court has made clear that some of Winter's proposed conduct—claiming to be "the Republican candidate"—would indeed violate the statute.  As an initial matter, in *Holder*, the plaintiffs' conduct was plainly prohibited by the statutory text itself.  Here, things look quite a bit different.  Winter's conduct is prohibited by a debatable application of a debatable interpretation of the actual text of the Canon.  This Court doubts that comity principles require it to reject a vagueness challenge out of hand simply because the state court has decided *ex post* that a plaintiff's conduct violates the terms of a statute whose terms bear little resemblance to the interpretation that the state court has given it.  More importantly, though, Winter wants to do more than merely say that he is "the Republican nominee."  He also wants to speak more generally about his relationship with the Republican Party.  For the reasons given above, that course of action would require delicate maneuvering indeed to avoid running aground on the Canon.  And thus the Canon is vague even as applied to the proposed conduct of Winter himself.  *Holder* is inapplicable for this reason as well.

political campaign." *Id.* (citing *White*, 536 U.S. at 782).  By banning a judge or judicial candidate from disclosing his party affiliation, the Circuit held, the Canon "increases the likelihood that one of the least relevant grounds for judicial selection—the fortuity of one's surname—is all that the voters will have to go on." *Id.*  Thus, the Sixth Circuit concluded, the Canon at issue in *Carey*—which forbade judges and candidates "from disclosing their party affiliation" with certain exceptions not relevant here—"violate[d] the First Amendment on its face." *Id.* at 204.

For the same reasons, the state cannot prevent a judge or judicial candidate from "mak[ing] speeches for or against" a party, either.  After all, allowing a judge to identify *himself* as a party member surely damages the state's proffered interests[9] more than would allowing a judge merely to speak for or against the party.  And meanwhile all of *Carey*'s overbreadth and underbreadth holdings apply equally to Canon (5)(A)(1)(c).  Specifically, the Canon prevents a candidate from announcing his views on many issues at once—by speaking "for or against" a certain party and its platform—and thus it is overbroad. *See Carey*, 614 F.3d at 201–02.  The Canon allows a candidate to speak "for or against" other "interest groups," and it still allows a judge to speak "for or against" a political party so long as she does so privately rather than in a "speech"—and thus it is underbroad as well. *See Carey*, 614 F.3d at 202.

Perhaps for these reasons, the Commission does not even mount a defense of Canon 5(A)(1)(c)'s "no speeches" clause. *See* R. 67 (failing to defend this section of the Canon); R. 100 (same).  Given that the Canon is on its face a content-based restriction on speech, it

---

[9] The two interests identified here are in "having a judiciary that is biased neither in fact nor appearance" and "diminishing reliance on political parties in judicial selection." *Id.* at 201.

was the Commission's burden to explain why the Canon survives strict scrutiny.  *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) (citations omitted).  The Commission has failed to provide that explanation.  Thus, it is unconstitutional to prevent judges or judicial candidates from "making speeches for or against a political organization."

On the other hand, the "endorsement" section of the canon—which forbids judicial candidates from endorsing or opposing a candidate for public office—implicates far different concerns.  The ruthless governor in Robert Penn Warren's *All The King's Men*, Willie Stark, was good at politics.  The political philosopher Thomas Hobbes was good at politics, too.  But though we can use that same word, "politics," to describe the profession of both Stark and Hobbes, we of course use it in two very different senses.  In the first sense—what we might call "high politics"—we refer to Hobbes's specialty: "the art or science concerned with guiding or influencing governmental policy."  *Webster's Third New Int'l Dictionary* 1755 (2002).  In the second sense—what we might call "low politics"—we refer to Stark's specialty: "competition between competing interest groups or individuals for power and leadership."  *Id*.

In a perfect world, we might want to remove from judicial elections "politics" in both senses of the word.  After all, in a democracy judges should be concerned with enforcing the policies enacted by the elected branches rather than with guiding or influencing policy themselves.  And judges certainly should not be helping individuals or interest groups achieve power or leadership.  Thus we might wish to ban judges and judicial candidates from engaging in any "politics" at all—high or low.  In an ideal world, voters would elect judges based on their judicial abilities rather than on their "politics" in either sense.

The problem is that the Supreme Court has made clear that states may not, as a general rule, ban judges from "high politics."  *See White*, 536 U.S. at 774 ("The Minnesota Supreme

21

Court's canon of judicial conduct prohibiting candidates for judicial election from announcing their views on disputed legal and political issues violates the First Amendment."). On the other hand, the Sixth Circuit has made clear that the state may—again as a general rule—restrict judges' participation in low politics, or at least low *party* politics. *See Carey*, 614 F.3d 201 (identifying a compelling state interest in "diminishing reliance on political parties in judicial selection").

The question is how to characterize "endorsements." As the Seventh Circuit held, "endorsements are not simply a mode of announcing a judge's views on an issue, or a shorthand for that view." *Siefert v. Alexander*, 608 F.3d 974, 983 (7th Cir. 2010). Instead, "endorsements primarily benefit the endorsee, not the endorser," and endorsements "may be exchanged between political actors on a quid pro quo basis." *Id.* at 984 (citation omitted). "[O]ffering an endorsement is less a judge's communication about his qualifications and beliefs than [it is] an effort to affect a separate political campaign, or even more problematically, assume a role as political powerbroker." *Id.* In short, endorsements are not only about "high politics," but about "low politics" as well.

And "[a]llowing judges to participate in politics"—really "low politics"—"would poison the reputation of the whole judiciary and seriously impair public confidence, without which the judiciary cannot function." *Bauer v. Shepard*, 620 F.3d 704, 712–13 (7th Cir. 2010). As the Seventh Circuit put it, "[w]e very much doubt that [the Supreme Court's decision in] *White* [] licenses federal and state judges to give stump speeches for candidates running for President, senator, governor, or mayor, or [to] act as leaders of political parties." *Bauer*, 620 F.3d at 712; *see also Wolfson v. Concannon*, No. 11-17634, 2016 WL 363202, at *5 (9th Cir. Jan. 27, 2016) ("When a judicial candidate actively engages in political campaigns, a judge's

impartiality can be put into question, and the public can lose faith in the judiciary's ability to abide by the law and not make decisions along political lines."). For this reason, the Seventh Circuit in *Siefert* drew a distinction between a "party affiliation rule, which impermissibly bars protected speech about a judge's *own campaign*," and an endorsement rule, which "addresses a judge's entry into the political arena *on behalf of his partisan comrades*." 608 F.3d at 984 (emphasis added).

That distinction makes sense. The Sixth Circuit held in *Carey* that judges and judicial candidates must be allowed to disclose their party affiliation because the restriction "potentially prevents candidates from announcing their views on many issues at once." 614 F.3d at 202. What the Circuit did not hold, however, was that judges and judicial candidates have a right to secure their elections (or help others get elected) as part of a partisan political machine. Quite the opposite, the *Carey* court specifically recognized that Kentucky has a compelling interest in "diminishing reliance on political parties in judicial selection." *Id.* at 201. This Canon advances that interest.

The remaining question is thus whether the Canon is narrowly tailored toward advancing that interest. The government may "regulate the content of constitutionally protected speech in order to promote a compelling interest" only if it "chooses the least restrictive means to further the articulated interest." *Sable Communications of California, Inc. v. FCC*, 492 U.S. 115, 126 (1989). As explained above, Kentucky has a compelling interest in preventing judges and judicial candidates from being part of a partisan political machine. And as also explained above, a judge who trades endorsements might well become part of that machine. Put another way, allowing endorsements would frustrate the state's interest and thus

23

forbidding endorsements is the "least restrictive means" to further that interest.  The Canon is therefore narrowly tailored.

Blau responds in two ways.  First, he says that an endorsement is no different than announcing one's political-party affiliation, merely a "shorthand way of announcing one's views on many topics of the day."  *Id.* at 202.  When a judicial candidate says that he is a member of the Republican Party, he is announcing his views about the platform of the party.  Likewise, the argument seems to go, when a judicial candidate says that he endorses Senator Jones, he is announcing that he agrees with the views of Senator Jones.  Although it is debatable that this is always the case—does endorsement *really* signal agreement with the endorsee's political views?  All of them?—the Court accepts this premise for the purposes of Blau's argument.

In addition to that "high politics" component of endorsements, however—merely indicating agreement with the endorsed party on *the issues*—there is a "low politics" component as well.  Endorsements "may be exchanged between political actors on a quid pro quo basis."  *Siefert*, at 984.  Thus, an endorsement might also be "an effort to affect a separate political campaign, or even more problematically, assume a role as political powerbroker."  *Id.* Put plainly, Kentucky has an interest in making sure that the county judge is not the county boss.  And for the reasons provided above, the anti-endorsement restriction is narrowly tailored toward advancing that interest.  So this argument fails.

Second, Blau contends that the Canon is not narrowly tailored because Kentucky could have chosen a less restrictive alternative, namely "appoint[ing] its judges, with a bipartisan and expert panel making nominations—a less restrictive alternative currently practiced by several states."  R. 68-1 at 24 (citing *Sanders County Republican Central Committee v.*

*Bullock*, 698 F.3d 741, 747 (9th Cir. 2012)).  The problem with that argument is *Williams-Yulee*, which concerned a state ban on in-person solicitation of campaign donations.  Replacing elections with an appointment system was surely an alternative in that case.  But the Supreme Court nevertheless found the challenged provision to be narrowly tailored, noting that "[a] state's decision to elect judges does not compel it to compromise public confidence in their integrity." *Williams-Yulee*, 135 at 1673.  So this argument fails as well.

In sum, Kentucky may prohibit judges and judicial candidates from "publicly endors[ing]" a "candidate for political office."  Canon 5(A)(1)(c).  But Kentucky may not prohibit judges and judicial candidates from "mak[ing] speeches for or against a political organization or candidate." *Id.*

### D.  Canon 5(A)(1)(b)

Blau asks the Court to strike down Canon 5(A)(1)(b), which forbids a judicial candidate to "act as a leader or hold any office in a political organization."  The Court lacks jurisdiction to grant that request, of course, unless Blau has the standing to challenge the Canon.  To have standing, a plaintiff must show among other things a "causal relationship between the [plaintiff's] injury and the challenged conduct." *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc*., 517 U.S. 544, 551 (1996).  Here, Blau says that he wants the Campbell County Republican Party to endorse him and that he wants to "help host events for the Party."  R. 94-1 at 16.[10]  Those actions, he says, would "likely [be] considered holding

---

[10] It is not clear why Blau believes that, if the party endorsed him, he would transform into a "leader" or "office[r]" of that party.  But whether that belief is a correct one is irrelevant to these purposes.  As explained in more detail below, the Kentucky Supreme Court has held that helping to host events is enough to make one a leader.  And Blau alleges that he wishes to help host events.  That allegation is enough to give Blau standing to challenge the canon.  If Blau receives an endorsement, and the Commission initiates proceedings against him as a result, he can of course mount a facial challenge, but the Court need not address that issue now.

office by or within the party." *Id.* Thus, Blau argues, he has two actual injuries—namely not being able to host events and not being able to solicit endorsements.

To answer that argument on its own terms, nothing in the Canon would seem to forbid Blau from doing either of those things. It forbids him only to act as an "office[r]" or "leader" in a political organization. An "officer" is "one who is appointed or elected to serve in a position of trust, authority or command." *Webster's Third New Int'l Dictionary* 1567 (2002). A leader is "a person who by force of example, talents or qualities of leadership plays a directing role, wields commanding influence, or has a following in any sphere of activity or thought." *Id.* at 1283. No definitions of the words "officer" or "leader" seem to include "someone who throws a fundraising party." Moreover, the Judicial Conduct Commission stated specifically (in its certification brief before the Kentucky Supreme Court as well as during oral argument) that the Canon would not prohibit Blau from doing what he wants to do. R. 92-1 at 14. Thus, it would seem as if Blau cannot show that Canon 5(A)(1)(b) "caus[ed]" his injury in any meaningful sense, which would mean that the Court lacks jurisdiction over his challenge to this Canon.

Nevertheless, the Kentucky Supreme Court held in its certification opinion that "one who hosts an event for a political party is 'acting as a leader' for the party." *Blau*, 2015-SC-000086 at 17. The reasoning seems to run as follows. A leader "plays a directing role" or "wields commanding influence." A host does those things, too, with respect to the event he is hosting. "Perforce," the Kentucky Supreme Court held, a host of a party's events is a leader of the party itself. *Id.* (A "judicial candidate hosting a political event acts as a leader of that event and is, in turn, acting as a leader of the political party on whose behalf the political event

26

is being held.").[11]  Thus, Kentucky law apparently does forbid what Blau wishes to do.  He has therefore shown injury-in-fact, which means the Court has jurisdiction over the case.[12]

Turning to the merits, the question is whether Canon 5(A)(1)(b) survives strict scrutiny. Without this Canon, a county judge could also be the president of the county Democratic Party. For the reasons given above with respect to Canon 5(A)(1)(c), however, a state has a compelling interest in making sure that the county judge is not also the county political boss. Forbidding a judge or judicial candidate to serve as a leader in a political party is—again for the reasons given above—a narrowly tailored way of advancing that interest.  It is probably the only way.  The Canon is therefore constitutional.

Blau responds that the Canon is not narrowly tailored for two reasons.  First, he says that the Canon is underinclusive because it "only address[es] speech that occurs beginning the day after a non-judge candidate has filed his intention to run for judicial office."  R. 94-1 at 16 (quoting *Wolfson*, 750 F.3d 1145, 1159 (9th Cir. 2014)).  As far as the Court can tell, the argument seems to run as follows: Kentucky could have forbade a non-judge to serve as a leader in a political party even before he declared himself a candidate for judicial office (exactly how long before, Blau does not say).  Kentucky decided not to do that.  Thus, Blau concludes, the Canon is underbroad.  The problem with that argument is that "[a] state need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns."  *Williams-Yulee*, 135 S. Ct. at 1668.  If the interest is preventing judges

---

[11] Again, the Court is bound by the Kentucky Supreme Court's interpretation of its Canons, but it is worth pointing out that the conclusion here simply does not follow from the stated premises.  The question is not whether the office of "host" and the office of "leader" include some of the same duties, *i.e.*, whether hosts and leaders both "play a directing role" or both "wield commanding influence."  Whalers and sushi chefs both "deal with fish" but it hardly follows, as a logical matter, that a sushi chef *is* a whaler.

[12] The defendants do not appear to dispute the other standing requirements.  *See* R. 100 at 13.

from becoming political bosses, preventing a judge (or judicial candidate) from serving as a political leader is surely a more "pressing concern" than preventing private citizens from serving as such leaders just in case they might one day choose to run for judicial office.[13]  This argument fails.

Second, Blau contends that the Canon is under-inclusive because the Canons "do not prevent a judge from serving as an officer in the Federalist Society, the local FOP lodge, the local Freemason chapter, the local Right to Life chapter, or a host of other organizations." R. 94-1 at 17.  "Instead," Blau says, "political parties themselves are singled out."  *Id.*  In his view, this demonstrates that "the Canon has nothing to do with preventing bias against parties or with respect to parties" and instead "has everything to do with a desire to target a particular affiliation with partisan political parties."  *Id.*

Quite right.  The interest is not in preventing bias against parties; the interest is in preventing judges from being too involved in political machines.  And political parties control who goes on the ballot in most elections in the Commonwealth; the local Freemasons do not. Thus, the state does not need to prevent a judge or candidate from leading the Freemasons.  It need only prevent him from leading a political party.  In any event, "[u]nderinclusivity creates a First Amendment concern" only if "the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way."  *Williams-Yulee*, 135 S. Ct. at 1670.  Preventing a judge from leading a political party regulates a different aspect of the problem—judges being too involved in

---

[13] Again, it is unclear what sort of alternative regulation Blau has in mind.  A rule forbidding a lawyer to serve as a political leader if he is contemplating a judgeship in the future, perhaps?  Blau does not say of course, but all of the alternatives that come to mind seem totally impractical if not downright Orwellian.

partisan politics—than preventing a judge from leading other community organizations.  So this argument fails as well.[14]

None of this is to say that preventing someone from hosting a party is a narrowly tailored way of promoting an interest in preventing judges from becoming political bosses. Blau has standing at this point to mount only a facial challenge.  After all, the Canon has not yet been applied to him and thus he cannot yet mount an "as applied" challenge.  And in a facial challenge, the statute survives so long as it has some "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citing *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring in judgment)).  It would be plainly legitimate to prevent a judge from serving as a "true" leader of a political party—a precinct captain, a county chairman, and so on—and thus the Canon is facially constitutional.  The question of party hosting is one that must be left for another day.[15]

### E.  Canon 5(A)(1)(d)

Blau challenges Canon 5(A)(1)(d), which prohibits a judicial candidate to "pay an assessment or make a contribution to a political organization or candidate."  The First Amendment "has its fullest and most urgent application to speech uttered during a campaign

---

[14] Blau also makes a passing reference to the Canon being overinclusive for two reasons. R. 94-1 at 19.  He points out that Kentucky could appoint judges or "require a disclaimer," *i.e.*, require a judge to disclose that he is a political-party leader. R. 94-1 at 19.  The second argument misunderstand the nature of the state's interest.  It is not, as Blau seems to imagine, an interest in preventing bias against parties.  It is an interest in preventing judges from being political bosses, thus undermining the public's faith in the judiciary.  The first argument was rejected, at least implicity, in *Williams-Yulee*.  The Court there could have said that the Florida provision was not narrowly tailored because Florida could simply appoint its judges.  It chose not to do so, of course, and thus the fact that Kentucky could appoint its judges does not mean that this Canon is unconstitutional.

[15] The same is true for Blau's contention that he wishes to receive an endorsement from the Republican party.  The Kentucky Supreme Court did not say in its opinion whether receiving endorsements would make a judge or judicial candidate a "leader" of a political party.  If Blau receives an endorsement, and the Commission believes that as a result Blau has become a leader of the party, and the Commission initiates disciplinary proceedings against Blau, then Blau can of course mount an as-applied challenge.  But none of those things have occurred at this point.  And thus the question of receiving endorsements is another one that must be left for another day.

for political office." *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (internal quotation marks omitted).  For these purposes, financial contributions count as speech.  *Buckley v. Valeo*, 424 U.S. 1, 17–18 (1976).  And thus strict scrutiny applies. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 312 (2010).  Kentucky may limit a judicial candidate's contribution to a political organization or candidate, therefore, only if that restriction is "narrowly tailored to serve a compelling interest."  *Williams-Yulee*, 135 S. Ct. at 2665.

The Commission has identified two such interests that, in its view, the Canon advances by forbidding judicial candidates to donate to other candidates and political organizations.  The first is in furthering "Kentucky's compelling interest in diminishing reliance on political parties in the election of judges," R. 100 at 24, an interest which (to belabor the point) the *Carey* court decided was a compelling one.  614 F.3d at 202.  As explained above, however, forbidding a candidate to speak "in favor of" a political organization is not narrowly tailored toward advancing that interest—specifically, it is overbroad and underbroad.  *See supra* at 19– 20 (citing *Carey*, 614 F.3d at 201–02). And under the Supreme Court's precedents, direct speech and monetary speech are functional equivalents.  *See, e.g.*, *Citizens United*, 558 U.S. at 339; *Buckley*, 424 U.S. at 19.  Thus, there is simply no difference between "saying" that one supports an organization by using words and "saying" that one supports an organization by donating money.  Put more plainly, if a candidate can speak the words "I support the Democratic Party," then he must likewise be allowed to put his money where his mouth is. Thus, for the same reasons given above, this Canon does not advance Kentucky's proffered interest in a narrowly tailored way.

The second interest that the Commission identified is an interest in preventing "bias against parties." That is of course a compelling interest. *See White,* 536 U.S. at 768. But the Sixth Circuit considered that interest in *Carey.* 614 F.3d at 201. It held that the problem was not the "Commonwealth's laudable interests in promulgating this canon" but rather "the Commonwealth's methods in furthering them." *Id.* The Canon at issue there prohibited a candidate from "disclosing his party affiliation in any form of advertising, or when speaking to a gathering, save in answer to a question by a voter in one-on-one or very small private informal settings." *Id.* (internal quotation marks omitted). That Canon did not "narrowly advance the State's interest" in preventing bias, the *Carey* court held, for two reasons. First, the Canon was overbroad because it "prohibit[ed] candidates from announcing their position on one issue of potential importance to voters: the party they support," thus violating the Supreme Court's holding in *White*. *Id.* Second, the Canon was underbroad because it did "too little to advance the State's interest in impartiality" by allowing candidates to disclose their party affiliation in private settings. *Id.* at 202. "That reality," the Court held, "undermines the suggestion that a candidate deals a fatal blow to judicial impartiality by revealing her party affiliations." *Id.*

Both of those things are true of this Canon as well, especially underbreadth. If a judge or candidate can tell people explicitly that he is a Republican, then it is hard to see how it would advance the state's interest—in preventing bias against litigants—to forbid a candidate to donate to the Republican Party. After all, the fear is presumably that a Republican judge might be biased against Democratic litigants, or at the very least that he might appear to be so biased. But after a judge has already made clear that he is a Republican, which he is at total liberty to do under *Carey*, forbidding him to donate to the Republican Party does nothing to

assuage that fear.  The horse has already escaped the paddock at that point; closing the gate after him does very little.  Thus, the Canon is not narrowly tailored toward promoting a governmental interest.  For all of these reasons, the challenged portion of Canon 5(a)(1)(D) is unconstitutional.

### F.  Canon 5(A)(4)

Blau challenges Canon 5(A)(4), which prohibits judges from engaging in "any other political activity except on behalf of measures to improve the law, the legal system, or the administration of justice[.]"[16]  As an initial matter, it is hard to know just what this Canon is talking about.  After all, the goal of every "political activity" is—in the end—to "improve the law, the legal system, or the administration of justice."  The goal of meeting constituents?  To find out their pet issues, write laws about those issues, and thereby improve the law.  The goal of fundraising?  To fund a campaign, get elected, and thereby improve the law.  Many Democrats believe that enacting the Affordable Care Act "improv[ed] the law"; many Republicans feel that repealing it would "improve the law."  But nobody engages in any "political activity" with the goal of "worsening" the law.  In his own mind, a political actor is always "improving" the law with his "political activities."

It is as if the Canon forbade a judge from "owning any bald eagles—except birds, of course."  What exactly is prohibited, one might ask?  Similarly, a candidate here might ask whether he can urge the governor to sign a bill, ask a legislator to introduce an amendment, solicit donations for a friend whom he believes would be a "fair" judge, or encourage his

---

[16] The Canon goes on to say "as provided in Canons 2(B) and (C)."  Those Canons do not add any clarity.  Canon 2(B) provides that "a judge may properly lend the prestige of the judge's office to advance the public interest in the administration of justice."  Canon 2(C) provides that a judge "may actively support public agencies or interests or testify voluntarily on public matters concerning the law, the legal system, the provision of legal services, and the administration of justice."

neighbor to vote "yes" on a referendum. Is each of these things an "effort to improve the law," a "political activity," or perhaps both? Thankfully, the Court need not answer that question. For these purposes, it is enough to say that the law fails to provide adequate notice of what speech is permitted and what speech is forbidden. It is therefore unconstitutionally vague. *See Hoffman*, 455 U.S. at 497.

The Commission responds that two cases out of the Seventh Circuit upheld a "similar provision" of the Indiana Code of Judicial Conduct. R. 100 (citing *Bauer v. Shepherd*, 634 F. Supp. 912 (N.D. Ind. 2009); *Bauer*, 620 F.3d 704). That is simply not true. Indiana's Canon forbade judges and judicial candidates to "act as a leader in," "hold an office in," or "make speeches on behalf of" a political organization. *Bauer*, 620 F.3d at 710–11. It likewise forbade "publicly endors[ing] or oppos[ing] a candidate for any public office." *Id.* Whatever else might be said about the Indiana Canons, they provided far greater guidance as to what speech is forbidden than the Canon here does. They did not, for example, prohibit political activities save for those done with an eye toward improving the law. Thus, the Seventh Circuit cases did not, in fact, uphold a "similar provision." And nothing else in those cases suggests that the Canon here provides sufficient guidance about what is forbidden. The Canon is therefore void for vagueness.

### G. Canon 5(B)(1)(c)—pledges, promises, or commitments

Jones challenges Canon 5(B)(1)(c)'s "pledges, promises, or commitments" clause, which provides that a judge "shall not, in connection with cases, controversies, or issues that are likely to come before the court, make pledges promises or commitments that are inconsistent with the impartial performance of the adjudicative duties of judicial office." As an initial matter, the Commission argues that Jones lacks standing to make this challenge

because the Commission has not yet decided whether her behavior—*i.e.*, pledging to work with other leaders to combat the heroin epidemic—violated the Canon.[17]

The question, however, is not whether the Commission will *definitely* sanction Jones, but whether she is under a "credible threat" of prosecution.  *Babbitt*, 442 U.S. at 298.  Here, the Commission's rules state that it only gives notice to a judge or judicial candidate after finding "probable cause for action concerning a judge."  SCR 4.170(1); SCR 4.170(2).  Thus, when the Commission sent Jones a letter suggesting that she had violated the Canon—and instructed her to "file a written response to the allegations [by a certain deadline]"—the Commission likewise suggested that it had found "probable cause" that she had violated the Canon.  R. 72-2 ¶ 8.  As Jones quite correctly points out, the Commission's argument "is akin to a prosecutor claiming that a defendant is not under a credible threat of prosecution after the grand jury finds probable cause and returns an indictment."  R. 99 at 6.  When a person receives word that an enforcement agency has determined that it has "probable cause" to sanction, that person is surely under a "credible threat" of prosecution.  That is what happened here.  Thus, Jones has standing to challenge Canon 5(B)(1)(c).

Turning to the merits, part of this Canon is constitutional; part of it is not.  The state surely may prohibit a judge from making a pledge in connection with a "case or controversy" that is likely to come before the Court.  For example, if a judge was aware of a car accident that had occurred in his bailiwick, the state could forbid him from promising to "rule in favor of the victim" or to "rule in favor of the defendant."

---

[17] The Commission acknowledges that Jones has standing to challenge the "false or misleading statements" part of the Canon.  R. 92 at 5.  The Commission explains that in its filing to the Kentucky Supreme Court, the Commission took the position that Jones's use of the term "re-elect" was false or misleading.  Thus, the Commission acknowledges that Jones faces a credible threat of prosecution based on this alleged violation.

The problem is that the Canon does more than that.  It forbids a judge to make a promise with respect to "issues" as well.  The state has an interest in forbidding judges to show bias in favor or against litigants.  *See White*, 536 U.S. at 776–77.  But the state has no interest in preventing judges from showing bias as to particular issues.  *Id.*  "At the broadest level of meaning, [the Canon] would seem to cover issues-related promises like" the ones the Sixth Circuit considered in *Carey*: *e.g.*, "'I commit to follow *stare decisis*'; 'I commit to follow an originalist theory of constitutional interpretation' or, for that matter, 'a living constitutionalist theory'; 'I commit to a purposive method of statutory interpretation' or, for that matter, a 'textual' one; 'I commit to use (or not to use) legislative history'; or 'I commit to be a rule-of-law judge.'"  614 F.3d at 208.  For precisely the same reasons given in *Carey*, the "issues" provision of this Canon is unconstitutional.  *Id.*

The Commission responds that the "issues" provision of the Canon is nevertheless constitutional because of its last clause, which forbids only those issues-related promises that are "inconsistent with the impartial performance of the adjudicative duties of judicial office." That clause was added after the Sixth Circuit struck down an earlier version of the Canon in *Carey*.  The district court upheld the revised version on remand, finding that the "inconsistent with impartial[ity]" clause made the Canon "significantly more narrow."  *Carey v. Wolnitzek*, 2012 U.S. Dist. LEXIS 142830 at *2 (E.D. Ky. Sept. 29, 2012).

True, the revised version is now narrower than it was before.  But it is also now vaguer and more circular.  May a judge pledge to be a textualist?  Or more pointedly, may one pledge, as Jones did, to "ensure that the law provides for stiff penalties for heroin dealers?"  R. 72-2 at 7.  Only if that pledge is "consistent with impartial[ity]," the Canon answers.  That rather begs the question, of course.  A state may certainly forbid a judge to act in a way "inconsistent with

35

impartial[ity]."  The question, though, is what statements are consistent with impartiality and what statements are inconsistent.  The Canon provides no answer to that question.  It is as if a criminal code forbade "any action—so long as it is a criminal action."  The state surely has an interest in banning "criminal action."  But it needs to say up front what exactly those actions are.  This Canon fails to do that.  The narrowing clause thus provides insufficient guidance as to what issue-related speech is forbidden and what issue-related speech is allowed.  That clause is therefore not enough to save the "issues" section of the Canon's "pledges or commitments" provision.

### H.  Canon 5(B)(1)(c)—false speech

Jones challenges the "false speech" provision of Canon 5(B)(1)(c), which forbids a judge or candidate to make "any . . . false statements" either "knowingly" or with "reckless disregard for the truth."[18]  In *United States v. Alvarez*, the Supreme Court rejected "the categorical rule . . . that false statements receive no First Amendment protection."  132 S. Ct. 2537, 2545 (2012).  Thus, just as with other content-based restrictions on speech, courts must analyze restrictions on false speech using strict scrutiny.  *See id.* at 2549.  The question is therefore whether the Commission's ban on false speech is "actually necessary" to achieve a compelling governmental interest.  *Id.*

Citizens assume that politicians will lie.  It is for this reason that phrases like "crookeder than a politician" are so common in our vernacular.  But judges are different.  "Judges are not

---

[18] It is worth noting that the plaintiffs seem to have taken different positions with respect to this Canon throughout the course of litigation.  In the plaintiffs' motion for summary judgment, R. 94, which was filed on behalf of all the plaintiffs, including Jones, the plaintiffs seem to concede that the Constitution would allow Kentucky to "prohibit knowingly or recklessly false statements of objective and material fact."  R. 94-1 at 35.  In Jones's response to the defendants' motion for summary judgment, however, she argues that "the 'false statement' clause of Canon 5(B)(1)(c) is unconstitutional on its face."  R. 99 at 10.

politicians," and a "[s]tate's decision to elect its judiciary does not compel it to treat judicial candidates like campaigners for public office." *Williams-Yulee*, 135 S. Ct. at 1662. And the Supreme Court has "recognized the 'vital state interest' in safeguarding 'public confidence in the fairness and integrity of the nation's elected judges." *Id.* at 1666 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889 (2009)). "The importance of public confidence in the integrity of judges stems from the place of the judiciary in the government." *Id.* Unlike the other branches of government, the judiciary "has no influence over either the sword or the purse; . . . neither force nor will but merely judgment." *Id.* at 1666 (quoting The Federalist No. 78 at 465 (Alexander Hamilton) (C. Rossiter ed., 1961)). A judge's authority "therefore depends in large measure on the public's willingness to respect and follow [her] decisions." *Id.* As Justice Frankfurter put it, "[j]ustice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 (1954). "It follows that public perception of judicial integrity is 'a state interest of the highest order.'" *Williams-Yulee*, 135 S. Ct. at 1666 (quoting *Caperton*, 556 U.S. at 889).

In short, the judiciary collapses if the public loses faith in its integrity; and one aspect of integrity, of course, is honesty. Put plainly, the public is unlikely to view a lying judge as a fair judge. Thus, the Commission is correct when it argues that there is a compelling governmental interest in preventing judges and judicial candidates from lying. The question, then, is whether the regulation at issue here is "actually necessary" to achieve that interest. The answer of course is yes. If the goal is to make sure that judges and potential judges are scrupulously honest, the only way of doing that is by forbidding such people to lie. Thus, the Canon seems to be narrowly tailored toward advancing a compelling governmental interest.

Jones responds in two ways.  First, she argues that the Canon is vague.  As detailed above, vague laws are those that "trap the innocent by not providing fair warning."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The test is whether a law "give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited."  *Id.*  Whatever else one might say about the Canon, one must admit that it gives ample guidance as to what is prohibited: intentional or reckless lies.  Thus, the Court is confident that this Canon will not "trap the innocent" for lack of fair warning.  Don't want to violate the Canon?  Don't tell a lie on purpose or recklessly.  Things would be different, of course, without the *mens rea* requirement.[19]  Given that the Canon punishes only "knowing" or "reckless" false statements, however, an innocent person will have no trouble conforming her conduct to the law.  It is quite challenging, after all, to "accidentally" do something intentionally or recklessly.

Second, Jones points to various bogeymen that, in her view, show that the law is overbroad.  The Canon might be read to cover "white lies," she says, or jokes, or private lies, or "[false] statements that actually have no bearing on the issues or the candidate's propensity for truthfulness."  R. 99 at 11.  As an initial matter, it is unclear how a candidate could intentionally make a false statement that nevertheless has "no bearing" on the "candidate's propensity for truthfulness."  Whether a candidate lies intentionally would seem to have quite a lot of bearing on that issue.  And that would seem to be true notwithstanding whether the lie was about the campaign, judicial duties, or some other topic entirely.

What Jones seems to really be arguing, though, is that the state has an interest in preventing only those false statements that are about "issues" or otherwise related to the

---

[19] This is not to say that all laws without mens rea requirements are unconstitutionally vague, only that this law might be vague without the mens rea requirement.

campaign. But the state's interest is broader than that. Kentucky wants scrupulously honest judges. A candidate can demonstrate dishonesty by lying about something related to the campaign. A candidate can likewise demonstrate dishonesty by lying about something unrelated to the campaign—an affair with an intern, for example. He's a liar either way, however, and Kentucky has an interest in keeping him off the bench. Caesar's wife must be above reproach, the saying goes, and Kentucky has made the laudable decision that judges must be as well.

As for Jones's contention that the Canon would prohibit innocent "white lies," that line of argument does not get Jones very far in a facial challenge. To demonstrate that the Canon is overbroad, Jones must show a "substantial number of instances . . . in which the law cannot be applied constitutionally." *Glenn v. Holder*, 690 F.3d 417, 422 (6th Cir. 2012). The Court can imagine a large number of false statements that Kentucky would be entitled to forbid. If a candidate falsely claimed to have spent twenty years as a judge, to have spent his career representing indigent clients, or to have been president of the local bar association, the state would be within its leeway to try to deter such a liar from holding a judgeship. Thus, when viewed "in relation to the statute's plainly legitimate sweep," the miniscule number of potentially unconstitutional applications that Jones identifies—jokes and white lies—do not seem to be "substantial." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (internal quotation marks omitted). The Canon is therefore not overbroad.[20]

---

[20] In her brief, Jones cites *Susan B. Anthony List v. Ohio Elections Commission*, 45 F. Supp. 765 (S.D. Ohio 2014), a case that the Sixth Circuit affirmed earlier this year. *See Susan B. Anthony List v. Driehaus*, 814 F.3d 466 (6th Cir. 2016). Although the Sixth Circuit did strike down Ohio's false statement laws in that case, the laws at issue applied to politicians rather than to judges and judicial candidates. *Id.* at 470. And as the Supreme Court made clear in *Williams-Yulee*, the judiciary is different for First Amendment purposes. *See Williams-Yulee*, 135 S. Ct. at 1662 ("A state's decision to elect its judiciary does not compel it to treat judicial candidates like campaigners for public office."). *Driehaus* is therefore distinguishable on its facts.

Jones also challenges the constitutionality of Canon 5(B)(1)(c) as it applies to her.  The problem with that challenge is that the Canon has not yet been "applied" to her.  Therefore, her challenge is not ripe.  The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted).  The ripeness doctrine serves to avoid "premature adjudication" of legal questions and to "prevent courts from entangling themselves in abstract debates that may turn out differently in different settings."  *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (internal quotation marks omitted).  The Commission has indeed taken the position, during this litigation, that what Jones said constituted "false" speech.  And the Kentucky Supreme Court has agreed with that interpretation.  *Blau*, 2015-SC-000086 at 20.  Specifically, the court held that "[a] judge who holds her office by way of a gubernatorial appointment cannot honestly claim that she was *elected* to the office, and if she seeks to retain the office at the next election, she cannot honestly assert that she seeks to be *re-elected*."  *Id.* at 21 (emphasis in original).  Thus, it is clear that Jones made a "false statement" as that term is used in the Canon.

The Commission has not yet decided, however, whether Jones made a false statement intentionally or with reckless disregard for its truth.  As it stands, all we have is a letter informing Jones that someone filed a complaint against her.  Thus, her as-applied claim depends on "contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).  "Answering difficult legal questions before they arise and before the courts know

how they will arise is not the way we typically handle constitutional litigation." *Warshak*, 532 F.3d at 526.  Jones's as-applied challenge is therefore not yet ripe.[21]

### I.   Canon 5(B)(1)(c)—misleading speech

The plaintiffs challenge the "misleading speech" section of Canon 5(B)(1)(c), which forbids judges or judicial candidates to make any "misleading statements" either "knowingly, or with reckless disregard for the truth."[22]  This section is unconstitutionally vague.  A candidate might, for example claim to be the "best," the "real Republican," or the "true Conservative" candidate.  She might likewise claim that her opponent "is not like you and me" and "is no friend of the middle class."  Are any of those statements misleading?  Perhaps.  The problem, though, is that a candidate has no way to know in advance whether the Commission will consider that speech misleading.  One man's soundbite is another man's misleading statement, as illustrated by the very facts here.  For example, Winter said that he was a Republican and that his opponents were Democrats.  Both statements were factually true— Winter is indeed a Republican; his opponents were indeed Democrats—but the Commission nevertheless sent him a letter implying that he had "misled" the voters by suggesting that the election was a partisan one.

As this Court previously noted, "[o]ur Founders wisely left to the public—not to the government—the weighty determination of whether political speech is true or misleading."

---

[21] The reason why these concerns do not apply to Jones's facial challenges is that, in the context of a facial challenge, "a relaxed ripeness standard applies to steer clear of the risk that the law 'may cause others not before the court to refrain from constitutionally protected speech or expression.'"  *Carey*, 614 F.3d at 196 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)).

[22] The Court did not ask the Kentucky Supreme Court to interpret the "misleading statements" section of the Canon. Thus, although the Kentucky court made clear that the "false statement" section forbade only statements of fact rather than statements of opinion, the court said nothing about what the "misleading statements" provision means.  This Court is therefore left to interpret that section of the Canon without assistance from the Kentucky Supreme Court.

*Winter v. Wolnitzek*, 56 F. Supp. 3d 884, 899 (E.D. Ky. 2014) (citing *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)).   The remedy for misleading speech is thus more speech, not less speech.   *See Whitney*, 274 U.S. at 649 ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."); *see also United States v. Alvarez*, 132 S. Ct. 2537, 2550 (2012) (plurality opinion) ("The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth.").   The Canon here fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited."   *Hoffman*, 455 U.S. at 498.   It thus carries the "risk of discriminatory enforcement."   *Reno*, 521 U.S. at 871.   And the Canon has an "obvious chilling effect on free speech."   *Id.*   The "misleading statements" clause is therefore unconstitutional.

The Commission responds that the *mens rea* requirement is enough to save the Canon. By its terms, the Canon forbids only those misleading statements made "knowingly" or with "reckless disregard for the truth."   Thus, the Commission argues, the Canon here is constitutional.   When the government regulates false speech, however, "there remains a risk of chilling that is not completely eliminated by mens rea requirements; a speaker might still be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable. And so the prohibition may be applied where it should not be applied, for example, to bar stool braggadocio or, in the political arena, subtly but selectively to speakers that the Government does not like." *Alvarez*, 132 S. Ct. at 2555 (Breyer, J., concurring).   This is because the true problem with the Canon is the actus reus rather than the mens rea: even reasonable people can disagree about what constitutes a "misleading"

statement.  Even with the mens rea requirements, therefore, the Canon would still likely chill protected speech.  That is reason enough to strike down the Canon.

Moreover, even with the mens rea requirement, the Canon forbids a judge or judicial candidate to make a "misleading statement" with "reckless disregard for the truth."  A particularly conscientious speaker might be able to avoid making misleading statements "knowingly."  But what does it mean to make a "misleading" statement "recklessly?"  Under Kentucky law, a person acts "recklessly" when he "fails to perceive a substantial and unjustifiable risk" that a certain result will occur.  Ky. Rev. Stat. 501.020(4).  And the "risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."  *Id.*

To avoid violating the Canon, therefore, a speaker must consider the "risk" that his statement would be "misleading."  (To a reasonable listener?  To his actual audience?)  He must then consider whether the risk of misleading is "substantial and unjustifiable."  (Unjustifiable as a means to what?)  And he must also fail to perceive a risk of misleading such that "it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."  (What kinds of misleading statements would a "reasonable person" choose to make?).  To avoid violating the Canon, therefore, the speaker would need to perform an Olympic-caliber routine of mental gymnastics before he could safely choose to speak.  We call that situation a "chilling" one.  The Canon is therefore unconstitutional.

## CONCLUSION

It is easy for those in the Article III courts to cluck our tongues schoolmarmishly at the idea of judicial elections—to recoil at the idea of mixing politics and judging.  Of course, those things are mixed somewhat in the federal system, too, as the current state of our judicial-

43

nominations process shows.  Each of us was appointed by a President beholden to the popular will.  And each of us was confirmed by Senators who would lose their jobs quite quickly if they disregarded the desires of their constituents.

Meanwhile the states are sovereign entities who have the prerogative to decide how their judges will be chosen.  They have the prerogative to choose just how insulated from the will of the people—or how responsive—they want their judges to be.  But there are gradations of responsiveness.  A state can choose to appoint its judges outright, as many do.  A state can choose to elect its judges in the same manner as other leaders, as many do.  And a state can take a middle course—as Kentucky has done—and allow the people pick judges but at the same time try to insulate those judges from the often dirty business of partisan politicking.  To the extent that Kentucky's judicial canons try to do that, they are constitutional.  And to the extent that the canons try to ensure that judges are honest—another laudable goal—they are constitutional as well.

We do have a First Amendment in this country, however, and that means states like Kentucky must be surgically precise when they enact what is in fact a speech code.  It also means that states cannot gag candidates from announcing their views on the important issues of the day.  Thus, to the extent that the canons are too vague—or limit what a judge or would-be judge can say about an issue—they violate the First Amendment.

Accordingly, it is **ORDERED** as follows:

(1)    The defendants' motion for summary judgment, R. 92, is **GRANTED IN PART AND DENIED IN PART**.

(2)    The plaintiffs' motion for summary judgment, R. 94, is **GRANTED IN PART AND DENIED IN PART**.

(3)     The defendants are **PERMANENTLY ENJOINED** from enforcing Canon 5(A)(1)(a).

(4)     The defendants are **PERMANENTLY ENJOINED** from enforcing the portion of Canon 5(A)(1)(c) that prohibits judges and judicial candidates from "mak[ing] speeches for or against a political organization or candidate."

(5)     The defendants are **PERMANENTLY ENJOINED** from enforcing the portion of Canon 5(A)(1)(d) that forbids a judge or judicial candidate to "pay an assessment or make a contribution to a political organization or candidate."

(6)     The defendants are **PERMANENTLY ENJOINED** from enforcing Canon 5(A)(4).

(7)     The defendants are **PERMANENTLY ENJOINED** from enforcing those portions of Canon 5(A)(1)(c) that prohibit a judge or judicial candidate to "make pledges, promises or commitments" with respect to "issues" and that prohibit a judge or judicial candidate to make any "misleading" statements.

This the 12th day of May, 2016.

**Signed By:**

*Amul R. Thapar*

**United States District Judge**